[Crim. No. 18818. First Dist., Div. Two. Mar. 13, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
HARRISON BUTLER, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Philip M. Brooks, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, and William D. Stein, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

MILLER, J.—Pursuant to a jury verdict finding him guilty of rape (Pen. Code, § 261, subd. 3), appellant Harrison Butler was sentenced to state prison for the upper base term of five years with an enhancement of three years for a prior felony (murder) conviction (Pen. Code, § 667.5). Appellant appeals from the judgment.

In the fact recital we give both the prosecution and defense versions of the evidence because one of the issues we are concerned with is whether the trial judge erred in refusing to instruct the jury regarding the use of circumstantial evidence.

Prosecution evidence revealed that on April 26, 1978, at approximately 11:45 a.m., Mrs. Emma G., a 68-year-old woman, entered the women's restroom at the end of Judah Street, near the beach in San Francisco. After relieving herself, she rearranged her clothes and was about to leave when she saw a man "loom" up at the closed stall door. She could see his head, his face, his collar and a little bit of the top of his shoulder. She testified that she had gotten "a very good look at his face."

The man pushed open the stall door, rushed in and began choking her. She began to "black out," catching a second "passing" glimpse of his face before falling into unconsciousness. As she regained consciousness a few seconds later, the man began choking her again. The next thing she was conscious of was lying on the floor between the toilet and the wall. The man had apparently pulled off her right boot and the right leg of her pantyhose and pantsuit, and she thought she felt him achieve penetration into her vagina. Telling her to stoop over and lean with her hands on the toilet, he tried (though unsuccessfully) to achieve penetration from the back. Afraid of being further harmed, she suggested that he sit down on the toilet and let her sit on his lap. He sat down, she astride his lap, with her back to him and he achieved penetration this way.

During this period she looked down at his pants and shoes. She particularly noticed that the man's pants were flared bottom jeans with faded spots, particularly at the knees; that his shoes were light tan leather tops with a raised fancy trim around the toes and a crepe rubber sole.

After appellant left the restroom, Mrs. G. returned to her apartment and called the police. They responded within minutes and took her description of the assailant. In addition to describing the man's shoes and jeans, she described the man's jacket as high collared and dark blue. She further described the assailant in terms of height, weight and age. She observed that his complexion was pale Negro; he had a nicely trimmed Afro haircut and trimmed moustache. Mrs. G. also drew a sketch of his face in the officer's notebook. The officer broadcast this description on the police radio and another car soon reported stopping a suspect matching this description. Mrs. G., who was on her way to the hospital with the first officer, was taken to the detention scene at a roadside in Golden Gate Park. This took place within half an hour after the rape. She identified the appellant by his facial features; but before

making a positive identification, she requested a full view of his clothing. Afterwards she told the officers, "yes, that's the man, the clothes look exactly the same." During booking, police retained appellant's jacket, shoes and pants, all of which were identified by Mrs. G., in court, as those worn by her assailant at the time of the attack.

Following the positive identification of appellant at the detention scene, Mrs. G. was taken to central emergency hospital where Dr. Bert Schloss examined Mrs. G. and determined that semen was present in her pubic hairs; that she had scrapes and redness around her neck and a bruise on her upper arm. Inside the vagina he noticed clear secretion tinged with blood, indicating intercourse.

Appellant denied categorically ever seeing or having any contact with the victim until she was brought to the detention scene. He testified that he arose about 6 or 6:30 in the morning on April 26 and read a book before his wife and daughter awoke. After breakfast, the three set off for the daughter's school at 9th and Kirkham. His wife left and appellant spent a few minutes with his daughter, then went for a walk in Golden Gate Park. He walked to the far side of the park, at Fulton Street, then reentered the park and stopped at the lake where boats are rented. He sat on a bench for awhile, watched children feed the ducks, then walked across a bridge to the island where he sat down and read his newspaper. He then started walking again and as he proceeded down South Drive a police car pulled along side and detained him.

Appellant's first contention on appeal is that the trial court wrongfully restricted his right to reasonably examine the jurors as to possible racial prejudice or prejudice arising from the nature of the crime (Pen. Code, § 1078). We disagree.

■ The purpose of voir dire of the jury is to permit a development of any potential basis for a challenge for cause. (*People* v. *Crowe* (1973) 8 Cal.3d 815, 824 [106 Cal.Rptr. 369, 506 P.2d 193].) As appellant suggests, a blanket foreclosure of inquiry of prospective jurors into certain topic areas such as racial prejudice may constitute reversible error. (*Swain* v. *Alabama* (1965) 380 U.S. 202, 219 [13 L.Ed.2d 759, 771-772, 85 S.Ct. 824].)

This is especially true where defendant is black and the outcome of the case depends on weighing the credibility of witnesses. (*Aldridge* v. *United States* (1931) 283 U.S. 308, 311 [75 L.Ed. 1054, 1056, 51 S.Ct.

470, 73 A.L.R. 1203].) But such is not the case here. Defense counsel was not precluded from inquiring into the area of prejudice; rather, the trial court restricted the scope and form of counsel's questions. This is entirely within the bounds of *Crowe.*

In *Crowe,* 8 Cal.3d 815, the California Supreme Court held that the lower court did not err in employing the method of voir dire under which the court, itself, conducts the examination and permits counsel to submit questions to the court which it finds to be within the scope of reasonable examination. (*Id.,* at p. 824.) And, if special circumstances in the case make defendant's questions relevant to show bias or other grounds for a challenge for cause, it is *his* burden to inform the court of his reasons for asking the questions. (*Id.,* at p. 830.) On these grounds, the court in *Crowe* held the trial judge acted entirely within his discretion when he precluded inquiry of a prospective juror as to whether being the only black on the jury panel "'might in any way place her in a compromising position.'" (*Id.,* at p. 829.) The court reasoned that since the juror had already made clear that her judgment would not be compromised by racial considerations, further inquiry was merely exploratory. (*Ibid.*) As *Crowe* emphasized, "[I]t is now well settled that a juror may not be examined on voir dire solely for the purpose of finding a basis to exercise a peremptory challenge." (*Id.* at p. 830.)

■ In light of *Crowe,* it cannot be said that defense counsel was unduly restricted in his inquiry of prospective jurors or denied due process of law.

Both counsel were allowed to conduct their own voir dire examination and to propound their own questions without submission to the trial court for approval. Defense counsel was specifically told that as long as he phrased his questions in a limited manner, he would be free to go into any area he felt was necessary. At no time was he prohibited from asking questions dealing with either racial prejudice or prejudice arising from the crime of rape. Rather, the trial court took issue with the "open-ended" format of defense counsel's questions. Such questions as "Do you think that racism is a problem in the United States?", or "Do you have any black friends?", or "What are your feelings about the crime of rape?", are clearly exploratory in nature and were properly excluded. Other questions propounded were not clearly improper: "Do you think you will be affected in any way by the fact that he is a black man married to a white woman?", could easily reveal hidden prejudices toward blacks not otherwise perceptible. Also, "Do you think that police-

men ever arrest the wrong person?", objection to which was sustained, could conceivably lead to challenges for cause. Since the case against defendant rested in part on the circumstances surrounding the police's detention, any bias either in favor or against police would be relevant. We note, however, that at trial, defense counsel did not attempt to rephrase this question with more specificity. Throughout the voir dire, he failed to indicate to the court how a particular question could lead to a challenge for cause. (See, *Crowe, supra*, at p. 831.) Thus, we find no miscarriage of justice.

■ Appellant next contends that the court erred in refusing to instruct the jury regarding the evaluation of circumstantial evidence under CALJIC No. 2.01,[1] and that this cautionary instruction was required because of the victim's extensive description of the clothes worn by her attacker. The rule authorizing the giving of CALJIC No. 2.01 when the prosecutor's case rests primarily on circumstantial evidence to prove an element of the crime is derived from the case of *People v. Bender* (1945) 27 Cal.2d 175 [163 P.2d 8] and reiterated in *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1]. *Bender* was a homicide case in which defendant was found guilty of killing his wife. Proof of guilt was entirely circumstantial. (*Bender, supra*, at p. 174.) At trial, defendant moved the trial court to give an instruction embodying the principle that to justify a conviction, the facts or circumstances must not only be entirely consistent with the theory of guilt, but must be inconsistent with any other rational conclusion. The trial court refused to give such an instruction. The California Supreme Court agreed with defendant and remanded after stating that the aforementioned principle "should be declared in every criminal case wherein circumstantial evidence is received." (*Bender, supra*, at p. 175.)

---

[1]CALJIC No. 2.01 (1975 rev.) reads as follows: "You are not permitted to find the defendant guilty of [the] crime charged against him based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled with any other rational conclusion. Each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt. If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

In *Yrigoyen*, a prosecution for issuing a check without sufficient credit with intent to defraud, proof of guilt was not entirely circumstantial as in *Bender*, but was based on both direct and circumstantial evidence. Nevertheless, in reversing the lower court, Chief Justice Gibson cited *Bender* for the proposition that where circumstantial evidence is *substantially* relied upon for proof of guilt, adequate instructions on the rules governing the application of circumstantial evidence must be given. (*Yrigoyen, supra*, at p. 49.) The court cautioned, however, that instruction need *not* be given, even upon request, where circumstantial evidence is only incidental or corroborative. (*Id.*, at p. 50.) (*People* v. *Salas* (1976) 58 Cal.App.3d 460, 473 [129 Cal.Rptr. 871].)

The question in the present case, therefore, is whether the prosecution's case rested substantially upon circumstantial evidence (in which case the giving of CALJIC No. 2.01 was required), or whether the circumstantial evidence in this case was merely incidental or corroborative under *Yrigoyen*, so as to vitiate the need for the instruction. We must accordingly reconsider particular facts to determine how much of the People's case rested on direct as opposed to circumstantial evidence.

The direct evidence in this case consisted of Mrs. G.'s visual observation of her assailant during the attack, and her prompt identification of him within 30 minutes at the scene of detention.

Appellant suggests, however, that the evidence in this case was primarily circumstantial. He reasons that the victim could not have directly observed the assailant in the bathroom since the stall door was too high to see a man's face "loom" above the top (according to defense exhibit F—the model scale door). It follows that *if* the victim failed to make a direct identification of appellant, the jury probably looked to circumstantial evidence to decide the case. The circumstantial evidence that the jury must have relied on was first, the matchup of the appellant's clothes to the victim's description of the clothes worn by her assailant; and second, the proximity of the detention scene to the scene of the crime. We cannot agree with this analysis.

First, it is presumptuous to say that the jury did not, in fact, rely on the victim's direct observation of her assailant. The facts are uncontroverted that the victim directly observed appellant's face, if not outside the stall door prior to the attack, then inside the stall door when the assailant began choking her. This direct observation is further corroborated by the accuracy of the victim's description of her assailant in

terms of height, weight and age, and by the sketch she drew for police. Furthermore, the jury may have well concluded that the victim did indeed identify appellant by direct observation, and merely "matched" his clothes to those of her assailant to reconfirm her initial identification. Thus, it cannot be said, ipso facto, that this case rested substantially on circumstantial evidence.

Second, under *People* v. *Pruitt* (1969) 269 Cal.App.2d 501 [75 Cal. Rptr. 125], direct evidence does not only encompass direct observations of the defendant's person. Descriptions of clothing may be considered direct evidence to the extent that "the witness is testifying to what his memory faculties are registering." (*Id.*, at p. 506.) Thus, such descriptions are akin to outward observation and as such, direct evidence. (*Id.*, at pp. 506-507.) To the extent that the match-up of appellant's clothing to that worn by the assailant was direct evidence of what Mrs. G. in fact saw, circumstantial evidence played a nominal role in this case.

Appellant suggests that in denying his motion for new trial, the trial judge's statement that, "the circumstantial evidence is very strong," undermined his previous refusal to give the 2.01 instruction. We disagree.

The circumstantial evidence was indeed strong in this case, but this did not preclude the fact that the prosecution's case substantially relied on direct rather than circumstantial evidence for proof of guilt. · Thus, the substantial evidence rule[2] compels us to affirm the trial court's action in refusing to give the 2.01 instruction.

██ Appellant further contends that the prosecution committed prejudicial misconduct when she told the jury during closing argument: "So to leave this particular exhibit, ladies and gentlemen, the only other thing I would point out was the demonstration you saw with the Defense Investigator, Miss Oppenheimer, cannot be considered by you as evidence in this case as to what [Mrs. G.] saw. The only thing that can be considered by you as evidence is what [Mrs. G.] said she saw."

---

[2]The rule was stated in *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805], as follows: "When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. [Citations.] [¶] When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]"

Appellant suggests that the prosecution's statement was a direct misstatement of law which, coupled with the court's failure to sustain the defense's objection, removed from the jury's consideration the most important defense evidence in the case.

We agree that the prosecutor's statement was a misstatement of law, and that the court should have sustained defense counsel's objection. But, we fail to find the error prejudicial to the verdict.

There is no doubt that the prosecutor's statement constituted improper argument. The full-scale model introduced by defense counsel constituted demonstrative evidence (Evid. Code, § 140) admitted in the trial judge's discretion over objection by the prosecution. As such, it was improper for the prosecution to state that "the only thing that can be considered . . . as evidence is what [Mrs. G.] said she saw." The prosecutor was implicitly inviting the jury to disregard altogether the exhibit as evidence of the victim's opportunity (or lack of opportunity) to perceive her assailant. Since the trustworthiness of the victim's identification of appellant was the key issue in this case, such a misstatement could conceivably be prejudicial whether committed inadvertently or intentionally. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].) But a careful look at the record reveals that the error here is not sufficiently harmful to merit reversal of appellant's conviction. Under the traditional application of this state's harmless error rule, the test of prejudice is whether it is reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from improper argument regarding consideration of the evidence. (*People* v. *Bolton, supra*; *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 872 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845].) The import of the "reasonably probable" test is that if the evidence clearly points to defendant's guilt or if there are other factors in the case showing defendant had a fair trial, the error will be found harmless. (*People* v. *Merriam* (1967) 66 Cal.2d 390, 395 [58 Cal.Rptr. 1, 426 P.2d 161].)[3]

Here there are significant factors indicating that any reasonable jury would have reached the same verdict even in the absence of the prosecutor's remark.

[3]Since no federal constitutional error occurred in this case, we need not follow the *Chapman* rule requiring the state "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065], in *People* v. *Bolton, supra*, at p. 214.)

First, notwithstanding the prosecutor's remark, the model stall and all accompanying defense evidence was put before the jury for their consideration. This evidence included expert testimony by one Steven Morris to the effect that he had constructed a scale model of a stall in the restroom where Mrs. G. had been attacked. Defense witness Anita Oppenheimer was then permitted to stand inside the model while appellant stood outside. This demonstration was admitted to show the jury that while standing inside the model, witness Oppenheimer could see no part of appellant's face. In her closing argument, the prosecutor correctly pointed out that the model was in evidence to be considered by them with whatever weight they chose to give it. Thus the jury was amply impressed upon by way of both testimonial and demonstrative evidence, the purported "lack" of opportunity for the victim to identify her assailant. Nevertheless, the jury found the evidence unconvincing. In light of the substantial evidence rule we are not in a position to find otherwise.

Second, the trial judge himself vitiated any impropriety of the prosecutor's remark when, following defense counsel's objection, he informed the jury that, "... this is argument of counsel... [i]f the argument doesn't appeal to you, you may reject it; if it does, you give it the weight to which you think it is entitled." Thus, the evidence in question was made available to the jury and the jury was properly told by both the prosecutor and the judge to weigh it as they saw fit. It cannot be said, therefore, that absent the prosecutor's misstatement it is reasonably probable that the jury would have returned a verdict more favorable to the defense. (*People v. Bolton, supra.*)

Appellant contends that the trial court abused its discretion in failing to grant a continuance in order that he could present a new trial motion based on the alleged incompetence and bias of a juror. The contention is without merit.

■ Our Supreme Court has long ago held that "[i]t is a settled rule of practice that an application for a continuance is addressed to the sound discretion of the trial court ...." (*People v. Collins* (1925) 195 Cal. 325, 332 [233 P. 97].) Its determination as to whether a defendant has affirmatively demonstrated that justice requires granting the motion "will not be disturbed on appeal in the absence of a clear abuse of that discretion." (*People v. Duck Wong* (1977) 18 Cal.3d 178, 189 [133 Cal.Rptr. 511, 555 P.2d 297].)

The question of whether a particular denial of a continuance is an abuse of discretion must necessarily turn on the circumstances of each case. (*People* v. *Reaves* (1974) 42 Cal.App.3d 852, 856 [117 Cal.Rptr. 163].)

■ At the hearing on his motion for new trial, appellant's counsel detailed his 12 unsuccessful attempts to subpoena juror Fuller to attend. Counsel also made an offer of proof that juror Fuller was having personal emotional problems at the time of trial, having trouble finding work, being evicted from her house, all of which she concealed on voir dire examination. The trial court denied a continuance on two grounds: First, the matter had been continued several times already, due diligence had been exercised, and there was no reason to suggest that the juror would be present in court if the matter were continued again. As a second ground, the court denied the motion for a continuance in the belief that the offer of proof would not support a motion for a new trial even if juror testified accordingly. (*People* v. *Sandoval* (1977) 70 Cal. App.3d 73, 82-83 [138 Cal.Rptr. 609].)

A new trial may be granted when the jury has been guilty of misconduct "by which a fair and due consideration of the case has been prevented." (Pen. Code, § 1181, subd. 3.)[4]

Appellant's argument on appeal is premised on juror Fuller's answer, "No," to defense counsel's question, "Is there anything at all that . . . you haven't stated [that] might make it difficult for you to be objective in a case like this?" In *People* v. *Castaldia* (1959) 51 Cal.2d 569 [335 P.2d 104], the misconduct of two jurors in a bookmaking case in giving false answers to questions asked on voir dire constituted reversible error. *Castaldia*, however, was a "close" case, consisting of one prosecution witness, and the jurors knowingly concealing a bias against bookmakers. (*Castaldia, supra*, at p. 570.) Here, appellant alleges that Mrs. Fuller "concealed" her personal trauma, not a bias or grounds for disqualification. There is no evidence that Fuller was incapable of performing the duties of a juror (Pen. Code, § 1072), or that she in fact did not perform her duties by answering "no" to defense counsel's ques-

---

[4]Section 1181 of the Penal Code provides, in part: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . .2. When the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property; [¶] 3. When the jury has. . .been guilty of any misconduct by which a fair and due consideration of the case has been prevented;. . ."

tion. As the trial court noted, the loss of a job or being evicted, though traumatic, does not ordinarily impair one from jury service.

Thus, no showing has been made that a fair consideration of the case has been prevented. Appellant concedes that the gist of his contention is that he has not been allowed "the opportunity to see whether he could make out a case of jury misconduct." The denial of the opportunity to explore the possibility of jury misconduct does not constitute prejudice to the appellant necessary to secure a reversal of a judgment for denial of a continuance. (See *People* v. *Laursen* (1972) 8 Cal.3d 192, 204 [104 Cal.Rptr. 425, 501 P.2d 1145].)

■ Based upon a finding that at the time of this conviction appellant had not been free from prison for a period of five years following a prior felony conviction for murder, the trial court determined that appellant's sentence should be enhanced by three years. (Pen. Code, § 667.5.)

On appeal, the appellant contends that the prior prison term for murder was not completed within the meaning of section 667.5, subdivision (g) because appellant had not yet been discharged from parole. We disagree.

As part of the determinate sentencing law, Penal Code section 667.5 provides for the enhancement of sentences for prior felony convictions for which prison terms were served. The length of the enhancement varies depending on the nature of the current crime and the nature of the prior crime or crimes. (Pen. Code, § 667.5 subds. (a) and (b).) Since the crime with which defendant is currently charged is rape and his prior conviction was murder, one of the "violent felonies" enumerated in the statute (see § 667.5, subd. (c)), any enhancement of his sentence on account of his prior conviction would be governed by subdivision (a) of section 667.5. The relevant portion of subdivision (a) reads: "Where one of the new offenses is one of the violent felonies specified in subdivision (c) in addition and consecutive to any other prison terms therefor, the court shall impose a three-year term for each prior separate prison term served by the defendant where the prior was one of the violent felonies specified in subdivision (c); provided that no additional term shall be imposed under this subdivision for any prison term served prior to a period of 10 years in which defendant remained free of both prison custody and the commission of an offense which results in a felony conviction."

Subdivision (g) of section 667.5 reads: "A prior separate prison term for the purposes of this section shall mean a continuous *completed* period of prison incarceration imposed for the particular offense alone or in combination with concurrent or consecutive sentences for other crimes, *including any reimprisonment on revocation of parole which is not accompanied by a new commitment to prison*, and including any reimprisonment after escape from such incarceration." (Italics added.)

Relying on this court's interpretation of section 667.5 in *People v. Cole* (1979) 94 Cal.App.3d 854 [155 Cal.Rptr. 892], appellant contends that because his parole was revoked and he was recommitted to prison, he is still serving the murder sentence imposed upon him and thus has not "completed" service of his prior prison sentence as defined under section 667.5, subdivision (g).

Mindful that *Cole* was decided by this court, upon reconsideration we find that we must reverse our position and expressly disavow the holding in *Cole*. Although we are still of the view that the literal wording of section 667.5 of the Penal Code is susceptible of the construction given it in *Cole*, such an interpretation of the statute leads to results which are both illogical and inequitable. ▇ It is an established rule of statutory construction that where a statute is susceptible of two constructions, the courts should adopt the construction which will render the statute reasonable, fair and harmonious with its manifest purpose. (*In re Eric J.* (1979) 25 Cal.3d 522, 537 [159 Cal.Rptr. 317, 601 P.2d 549]; *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].)

The logical fallacy of *Cole* was pinpointed by the appellate court for the Fourth District: "The immediate cause for the mistake of the *Cole* court appears to be its conclusion that, since a 'prior separate prison term' includes any reimprisonment on revocation of parole which is *not* accompanied by a new commitment to prison, a reimprisonment upon revocation of parole that *is* accompanied by a new commitment precludes the term served on the original conviction from constituting a 'prior separate prison term.' That is a non sequitur; that is not what subdivision (g) says. Subdivision (g) says that reimprisonment on parole which is not accompanied by a new commitment is *included* in the 'prior separate prison term.' The converse is that a reimprisonment upon revocation of parole which is accompanied by a new commitment to prison *is not included* in the 'prior separate prison term.' In other words, the subdivision simply directs when reimprisonment on revoca-

tion of parole is or is not to be included in the 'prior separate prison term.' Either event presupposes the existence of a 'prior separate prison term.'" (*People* v. *Espinoza* (1979) 99 Cal.App.3d 59, 70 [159 Cal. Rptr. 894].)

Appellant's interpretation of *Cole* must fail in light of the absurd consequences that would flow when carried to its logical conclusion. As the appellate court in *People* v. *Espinoza, supra*, explained: "First, if defendant's position or the statutory interpretation indicated in *Cole* were accepted, the propriety of a trial court's enhancing the sentence imposed on a convicted felon on account of a 'prior separate prison term' would turn on whether or not at the time of sentencing his parole had been revoked and he had been recommitted to prison. The determination as to whether or not parole should be revoked and the parolee recommitted to prison is made by the Community Release Board in the exercise of its discretion. Frequently, no decision is made on those questions by the Community Release Board until after trial on the current charges. If parole were not revoked and reimprisonment ordered until after the imposition of sentence on the new conviction, a sentence enhancement proper at the time made would be rendered improper by the subsequent actions of the Community Release Board. In addition, if, as in the present case, the additional term imposed because of parole revocation were completed prior to conviction of the new charges, the prior prison term would have been 'completed' prior to conviction of the new offense, and an enhancement to the sentence imposed on the new offense would appear proper. Obviously, the existence or nonexistence of a 'prior separate prison term' and the propriety of enhancement of sentence ought not and were not intended to turn upon the irrelevant timing of these events, and a rule permitting the determination to turn upon such considerations would only invite manipulation." (*Espinoza, supra*, at p. 73.)

The irony of defendant's interpretation of the statute per *Cole* is that one who faithfully obeys the law while on parole and successfully serves parole would have "completed" his prior prison term and would be subject to an enhancement if later convicted of a felony, whereas one who committed another felony while on parole would not be subject to enhancement of sentence with respect to the subsequent conviction. ■ We must recall the purpose of enacting the determinate sentencing law: to increase the penalties incurred by repeat offenders and thus deter recidivism. (See *People* v. *Espinoza, supra*, at pp. 73-74.) Such a purpose would be clearly undermined were we to find that the legislative

intent was to provide a harsher treatment for a felon who has successfully completed parole "than for a felon who has committed yet another felony while on parole." (*People* v. *Espinoza, supra*, at p. 74.)

Judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

Petitions for a rehearing were denied April 11, 1980, and appellant's petition for a hearing by the Supreme Court was denied May 8, 1980.