[Crim. No. 35109. Second Dist., Div. Four. Feb. 21, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
EUGENE PEGGESE, Defendant and Appellant.

COUNSEL

Eugene Peggese, in pro. per., and Thomas Kallay, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BURKE (M. L.), J.*—Defendant was convicted by a jury of one count of rape (Pen. Code, § 261, subds. 2 and 3) and sentenced to state prison. He appeals.

Upon awakening at about 6 a.m. on July 21, 1978, the victim, Mrs. Hendricks (56 years old), and her husband both dressed and Mr. Hendricks left the hotel room where they had been staying to get them some food. The cafe where Mr. Hendricks went was about 6 blocks away and he was there about 45 minutes to an hour waiting for the

---

*Assigned by the Chairperson of the Judicial Council.

food to be prepared. About 20 minutes after her husband left, Mrs. Hendricks heard a knock at the door. Believing it was her husband returning, she unlocked and opened the door.

Defendant, a man she had never seen before, stood in the doorway, said, "I want some of you," pushed the door open despite her efforts to close it, and rushed inside. He pushed her over onto the bed, held her down and tore off her clothing. She repeatedly begged him, "Don't do this," and began screaming for help. Defendant slapped her and put his hand over her mouth when she screamed. With one hand keeping her down, he removed his pants and shirt with his other hand and inserted his penis into her vagina. He was on top of her "something like" half an hour.

In the meantime Mr. Hendricks returned from the cafe to find the door to their room unlocked, which was unusual since Mrs. Hendricks always locked it when he went out. He opened the door and saw defendant on top of his wife on the bed. She was crying. They were both unclothed. Defendant turned and looked at Mr. Hendricks, then rolled off the bed and, leaving his clothing, ran past Mr. Hendricks to the room directly across the hall. Mr. Hendricks heard a door open and close. Mr. Hendricks tossed defendant's clothing out into the hall. His wife was hysterical and, since there was no phone in the room, Mr. Hendricks told her to get her clothes on and they would go down to the lobby and call the police. It took about five minutes for her to get dressed and for them to get downstairs where they told the manager, Mr. Parson, and the desk clerk, Mr. Rabke, what had happened.

Mr. Rabke immediately called the police. While waiting for their arrival about 10 minutes later, and within minutes after Mr. and Mrs. Hendricks had come downstairs, defendant appeared on the stairway. He came down carrying some clothing and said he was going to the laundry. Mr. and Mrs. Hendricks screamed, "That's the man."

Mr. Parson recognized defendant as the man who occupied the room directly across from that of Mr. and Mrs. Hendricks. He told defendant that no laundry was open in the area at that hour and detained him until the police arrived. Defendant was arrested by the officers after Mr. and Mrs. Hendricks identified him as the rapist.

Defendant was being detained by Mr. Parson when Officer Morgan and his partner arrived in response to the call. Mrs. Hendricks was cry-

ing and unable to talk. Mr. Hendricks told him what happened and pointed out defendant as his wife's attacker. Mrs. Hendricks was later calm enough to talk and she, too, positively identified defendant.

Officer Morgan recalled having seen defendant earlier that same morning, at about 2:30 a.m. Defendant was alone on foot at the time and the officers were seated in their patrol car waiting for a traffic light to change. The location was about two blocks away from the hotel where defendant was subsequently arrested. Defendant was standing on the curb about two or three feet from the passenger side of the car where Officer Morgan was seated.

Defendant asked what the problem was with the women in Long Beach. The officer inquired as to why he was asking. Defendant replied that he was having some trouble in locating a woman. The officer then jokingly commented that it might be his approach. He said to defendant, "Maybe what you need to do is offer them some gifts or possibly propose marriage to someone." Defendant stated that he had proposed marriage and had even gone so far as to buy gifts, but for some reason they still rejected him.

The officer, having by then concluded that possibly defendant had some mental problem, and in a "private joke" with his partner, stated that there was a place called "Norwalk" (having in mind Metropolitan State Hospital), and asked defendant if he had ever attempted to talk to anyone in Norwalk about it. Defendant answered in the negative, but said he would be willing to go if someone would take him there and if someone was there who was willing to marry him. At this time a call came through the dispatcher and Officer Morgan informed defendant of this and said they would have to leave. Defendant concluded the conversation by stating, "Thank you. I guess I'll go find me a woman." He then turned and walked off. The entire conversation lasted about 30 or 40 seconds. The officer smelled no alcohol on defendant's breath.

When, during the trial, the prosecutor first began to question Officer Morgan about the aforementioned street-corner conversation with defendant, defense counsel objected and asked for a bench conference. Out of the presence of the jury an offer of proof was given by the prosecutor, and defense counsel objected on general hearsay and relevancy grounds. The court overruled the objection and the testimony as to the conversation followed.

## I

As grounds for reversal, defendant first contends the trial court erred in permitting Officer Morgan to relate his street-corner conversation with defendant. It is argued that (1) the only relevance of this testimony was to suggest "that appellant had the general propensity to commit rape," and further, (2) that since the issue in the action "was not appellant's state of mind but whether appellant had been the perpetrator of the offense," the statement was inadmissible hearsay. Neither argument has merit.

Defendant's statement to the officer, made a few hours before the attack on the victim, indicating frustration in his repeated attempts to find female companionship and resolve that he "was going to find me a woman," was certainly relevant, in that, by reasonable inference, it suggested that he had carried out his intention by perpetrating the crime. "[W]hen an intent has been declared to do a particular thing, an inference may be drawn that the thing was done. [Citations.]" (*People v. Horace* (1954) 127 Cal.App.2d 366, 369 [273 P.2d 923].) Nor was the statement rendered inadmissible by the fact it did not, on its face, absolutely manifest the intention to commit a rape. The test of relevancy is whether the evidence tends, logically, naturally, or by reasonable inference to establish a material fact, not whether it conclusively proves it. (*People v. Ott* (1978) 84 Cal.App.3d 118, 127 [148 Cal.Rptr. 479].) "[T]o be admissible, evidence need not absolutely confirm anything. It is axiomatic that its weight is for the jury." (*People v. Vernon* (1979) 89 Cal.App.3d 853, 869 [152 Cal.Rptr. 765].) And the statement was not excludable as hearsay since Evidence Code section 1250 makes a statement of the then existing state of mind of the declarant admissible to "prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a)(2).) Thus, a statement of a declarant's intent to do certain acts is admissible to prove that he did those acts. (*People v. Alcalde* (1944) 24 Cal.2d 177, 185 [148 P.2d 627].)

## II

During its deliberations a request was made by the jury to view the crime scene. The jury foreman stated as reasons for the request that "some of us would like to see the proximity between the rooms...and to come to some understanding of the acoustics between the second and third floors...and also to look at the security system; that is, the

buzzer system entering the stairway from the lobby." The court, without objection from defense counsel, denied the request. Defendant now cites this refusal as error.

In denying the request the trial judge explained that to permit a jury view at that point would require a reopening of the case; would be difficult to arrange; would present too many hazards; and that he did not believe the circumstances warranted it.

Penal Code section 1119 authorizes the trial court to permit the jury to view the scene of the crime, "[w]hen in the opinion of the court, it is proper...." In other words, the granting or denial of motion for a jury view rests in the sound discretion of the court. (*People* v. *Conway* (1962) 207 Cal.App.2d 657, 660 [24 Cal.Rptr. 635].)

No case has been cited by defendant where a jury view was ever permitted after the case was finally submitted to the jury. The only California case disclosed by our research where a jury view was requested after submission of the case to the jury is *People* v. *Hawley* (1896) 111 Cal. 78 [43 P. 404]. In that case, defendant requested during trial that the jury be permitted to view the scene of the crime. The request was denied, and the matter was ultimately submitted to the jury for decision. The jury thereafter indicated that they were unable to reach a verdict and requested that they be allowed to view the premises in question. The Supreme Court noted that "[t]hough such proceeding is an irregularity," it would have been within the discretion of the trial court to grant the jury's request, since the defendant had "asked for such order at the proper time before the close of the evidence,..." (*People* v. *Hawley, supra*, at pp. 84-85.) In the instant case, no such request was made by the defendant, either during the trial or after submission of the case to the jury.

As the trial judge pointed out when the request was made, to grant it would require a reopening of the case. Neither side requested that the court allow such a procedure. As to what could be gained from it, the testimony of the witnesses, as elicited on direct and cross-examination, adequately described the crime scene. With regard to the acoustics between the second and third floors of the hotel, the sounds could not be duplicated. Nor was any real value shown in the request to inspect the security system at the hotel. In short, the trial court quite properly exercised its discretion to deny the requested jury view.

## III

■ After jury selection and before calling the first witness, a defense-requested hearing was held on a motion to exclude the prospective in-court identification of defendant by the victim and her husband. The hotel manager testified and the preliminary hearing testimony of the victim was presented by stipulation. Whereupon, the court denied the motion. Essentially, the evidence presented was the same as that subsequently developed at the trial (see above statement of facts), namely, that the defendant was positively identified by the victim and her husband, in the presence of the hotel manager, when he came down to the lobby of the hotel a few minutes after the crime; that he was thereafter pointed out by them to the police when the officers arrived a few minutes later.

Defendant questions "whether under the facts of this case it was fair to base appellant's identification as the rapist on a confrontation which occurred within minutes after the incident under circumstances which inevitably made that identification highly suggestive..." when he "was confronted with two people who were, understandably, in a highly emotional state." We cannot see any unfairness. As defendant must concede, the exclusionary rule for in-court identifications applies only to suggestive pretrial identification procedures utilized by police officers. (See *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; and *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].) Here the identification of defendant and his apprehension took place before the police were called. Absolutely no basis existed for the court to exclude such evidence. The weight to be given the testimony of the witnesses, considering all of the circumstances, such as their emotional state at the time the identification was made, was solely for the jury to decide.

## IV

Defendant received a 308-day credit on his 4-year (middle) term of imprisonment. This included 264 days for time actually spent in presentence custody and 44 days for "good time" earned during presentence custody. The court refused to give him an additional 44 days credit for presentence "work time."

Defendant contends he is entitled to both good time and work time credits earned during presentence custody.

The People, on the other hand, contend that defendant was entitled to neither good time nor work time credits and that the trial court exceeded its jurisdiction in giving him the 44-day credit for "good time."

On February 19, 1980, our Supreme Court filed its opinion in *People v. Sage*, 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874], holding that committed felons are entitled to presentence "conduct" credit which includes credits for both work performance and good behavior. The decision is not yet final. For the purpose of our decision it is sufficient to note that when the issue which is pending in *Sage* is finally resolved, the defendant may obtain whatever credits he is entitled to administratively or by appropriate writ proceedings. (See *People* v. *Wende* (1979) 25 Cal.3d 436, 443 [158 Cal.Rptr. 839, 600 P.2d 1071].)

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied March 14, 1980, and appellant's petition for a hearing by the Supreme Court was denied April 17, 1980.