[Crim. No. 37609. Second Dist., Div. Two. May 26, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
TOM YU, Defendant and Appellant.

COUNSEL

Robert M. Sanger, under appointment by the Court of Appeal, and Sanger & Helgesen for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert R. Granucci and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

COMPTON, Acting P. J.—Defendant Tom Yu appeals the judgment entered following a jury trial in which he was convicted of five counts of first degree murder (Pen. Code, § 187), eleven counts of assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)), one count of conspiracy to commit murder (Pen. Code, §§ 182, 187), and one count of conspiracy to commit assault with a deadly weapon (Pen. Code, §§ 182, 245, subd. (a)). Armed allegations as to all 18 offenses were found true. Probation was denied and defendant was sentenced to state prison for life. ██ ██ ██ ██ We affirm the judgment.[1]

The convictions stem from what has become known as the "Golden Dragon Massacre." (See *People* v. *Szeto* (1981) 29 Cal.3d 20 [171 Cal.Rptr. 652, 623 P.2d 213].) In that incident members of a Chinese youth gang, the Joe Boys, seeking revenge on members of two rival Chinese youth gangs, the Wah Ching and Hop Sing, entered a crowded restaurant in San Francisco's Chinatown and opened fire on the patrons, killing and wounding innocent bystanders. Although defendant was not involved in the actual shootings, he was prosecuted as the instigator of the attack.

The underlying facts giving rise to the charges are not in dispute. On the evening of September 3, 1977, a Saturday, several members of the Joe Boys, including defendant, met at the home of Burt and Sandra Rodriguez in Pacifica and discussed retaliating against the Wah Ching and Hop Sing for the murder of another Joe Boy, Felix Huie, in July of that year. Such meetings, however, were not uncommon. The hostility that existed between the rival groups had grown in intensity over the years, frequently resulting in violent confrontations. On several occasions, defendant, 18 years old and a recognized leader of the Joe Boys, along with other gang members organized assassination squads for the purpose of eliminating the Wah Ching and Hop Sing Boys from the streets of Chinatown.

In early 1977, the Joe Boys began acquiring a small arsenal of weapons, including two shotguns and a semiautomatic rifle. In July or August of that year,

---

[1]Defendant contends that he is entitled to an automatic reversal of the judgment because one or more of the court reporters involved in the case allegedly have failed to provide a complete record of all proceedings. This court denied with prejudice a similar claim made by defendant on January 15, 1982. We see no reason to reconsider our decision at this time. The record appears to us to be complete.

defendant asked Burt Rodriguez if the guns could be stored in his house. Rodriguez, who over a period of years had become friends with defendant and other members of the gang, acquiesced in the request. The weapons were wrapped in a cloth and kept in the front closet of the home.

On Monday, August 29, 1977, five days prior to the shooting, defendant arranged a meeting with Carlos Jon, a member of yet another youth gang, to obtain detailed information concerning the whereabouts and movement of both the Wah Ching and Hop Sing. Defendant was specifically interested in where the gang members would be during the upcoming weekend and where they usually went for a late night snack. As their conversation ended, defendant gave Jon a phone number where he could be contacted the following Saturday and receive the information.

On Friday evening, September 2, 1977, defendant and several other Joe Boys assembled at the Rodriguez home to discuss the possibility of attacking the rival gangs sometime that weekend. The weapons were retrieved from the front closet and displayed in the living room. During the conversation that ensued, it was decided that the actual shooting would be done by those who were under eighteen years of age because they "wouldn't be going to jail so long."

At approximately 1 a.m., the phone rang and defendant left to take the call in another room. After completing his conversation, he returned to the group and ordered that the guns and ammunition be placed back into the closet. Defendant and several others left the house the next morning and arranged to meet in Daly City at the home of Peter Cheung.

By 9 p.m., on September 3, 1977, the group, consisting of defendant, his two brothers Chester and Dana, Melvin Yu (no relation), Peter Ng, Peter Cheung, Curtis Tam, Kam Lee, and Don Wong, had returned to the Rodriguez' home. The talk quickly turned to getting revenge on the Wah Ching. At approximately 9:30 p.m., Cheung and Dana Yu were directed to steal a four-door automobile, which would allow for quick entry and exit, for use that night. Shortly thereafter they returned with a blue Dodge Dart and parked it in the driveway to the Rodriguez' home.

After Mr. and Mrs. Rodriguez returned home from dinner and retired to the bedroom, the guns were once again brought from their hiding place. Defendant then remarked to Curtis Tam that Melvin Yu and Peter Ng were going to use the weapons to shoot the Wah Ching. When Tam indicated that he wanted to use the phone, defendant told him that it was impossible because he was waiting for a very urgent call.

At about 2 a.m., on September 4, 1977, defendant received the call he had been expecting from Carlos Jon, informing him that members of the Wah

Ching and Hop Sing were then in the Golden Dragon Restaurant. Within minutes, the Joe Boys had armed themselves with the weapons and ammunition they needed to accomplish their mission. Melvin Yu took the automatic rifle, Curtis Tam the sawed-off shotgun, and Peter Ng a conventional shotgun and a .38 handgun. Chester Yu drove the group to the Golden Dragon in the vehicle stolen earlier that evening. Kam Lee followed in a different automobile. Defendant, Dana Yu, and Don Wong each stayed behind at the Rodriguez home. As the cars sped away from the house, defendant yelled out: "Good luck."

At 2:40 a.m., with Chester Yu remaining in the car, Melvin Yu, Tam and Ng, their heads covered with nylon stockings, entered the restaurant and without warning fired a series of shots through the crowded rooms. Although their intended victims escaped injury, five bystanders were killed and eleven wounded. Chester Yu drove the killers back to the Rodriguez residence where they placed the weapons back into the closet. Defendant and at least one other member of the gang greeted the group upon their return home.

The next day the guns, and other incriminating evidence, were thrown into the waters of the San Francisco Bay. Soon thereafter, defendant and his cohorts fled the city. A week or two later, defendant contacted Carlos Jon by phone and told him to "keep cool." The two were never again in contact.

In April 1978, defendant and his brothers, Chester and Dana, went to see Mr. George Walker, an attorney, in the hope of making a deal for themselves. Mr. Walker called Mr. Hugh Levine, an assistant district attorney, who had been assigned to the Golden Dragon case.

Levine and Walker then met on April 3, 1978. Walker told Levine that he represented three people. Two of them, Walker explained, were only "peripherally" involved. The third person who was the driver of the car was said to be a juvenile. Their identities were not disclosed to the prosecutor.

Walker described defendant as "a peripheral figure who had inadvertently answered a telephone call at the house in Pacifica." Walker further explained that this telephone call provided the information that some members of the Wah Ching and the Hop Sing were in the Golden Dragon Restaurant. Walker stated that he wanted immunity for the two "peripherally" involved persons and a juvenile court disposition for the driver, in exchange for testimony against the persons who actually did the shooting.

The district attorney's office decided that the two peripherally involved persons would be considered for immunity subject to two conditions precedent, those being (1) a determination that their roles in the crime were in fact peripheral, and (2) a determination that their proposed testimony was truthful.

The juvenile court disposition for the third person was acceptable. Levine subsequently contacted Walker and told him of this decision. Later that same day Walker called Levine and informed him that his clients would accept the offer.

On April 19, 1978, Walker and his clients met with Levine. Until this meeting no one knew the identity of Walker's clients. After hearing Walker's statements about his clients' proposed testimony, it was decided that the deal for immunity for defendant, Tom Yu, could not be consummated. This decision was made on the basis of information already known to the district attorney that Tom Yu, as the leader of the gang, probably had a much larger role in the Golden Dragon killings than that of a "peripheral figure" who "inadvertently answered the phone." Therefore, a grant of immunity for defendant was never consummated. The arrangement as to the other two individuals was consummated.

On April 20, 1978, Chester Yu directed officers of the San Francisco Police Department to a location in the San Francisco Bay in the area of Burlingame, California. Officers retrieved from the bay two shotguns and a Commando semiautomatic rifle resembling a Thompson submachine gun. Also recovered was a .38 caliber revolver. Subsequent ballistics tests revealed that the bullets removed from the deceased victims, as well as those injured, matched the weapons found in the bay.

Apparently Chester Yu also advised police that a "Carlos" had made the phone call to the house in Pacifica. From that information, Carlos Jon was developed as a witness for the prosecution.

Defendant, after obtaining another lawyer, surrendered to the San Francisco Police Department following Memorial Day weekend in 1978.

After defendant was indicted, he moved to dismiss the charges, contending that he had been promised immunity from prosecution by the district attorney in return for his testimony. The motion to dismiss was denied.

In denying the motion, the trial court found that the offer of immunity was premised on the satisfaction of the two conditions precedent. The court also found that the district attorney had a good faith belief, based upon previously developed information, that the defendant's proposed testimony was not true. Therefore, the court determined that there never had been a final agreement of immunity for defendant.

■ Findings of fact made by the trial court will not be disturbed on appeal unless there is no substantial evidence to support them. (*People* v. *Butler* (1980)

104 Cal.App.3d 868, 878, fn. 2 [162 Cal.Rptr. 913].) ▮ After a thorough review of the record, we can only conclude that the trial court's findings are supported by substantial evidence.

Further, a grant of immunity in a criminal case requires compliance with Penal Code section 1324.[2] (See *People* v. *Brunner* (1973) 32 Cal.App.3d 908, 912-913 [108 Cal.Rptr. 501].) That section requires judicial approval of all grants of immunity. (*Id.,* at pp. 914-915.) Here, there was no such approval of the immunity purportedly promised defendant.

In some instances the prosecution may be estopped from asserting the lack of compliance with the statute. (*Id.,* at pp. 915-916.) However, in cases where the courts have found estoppel, the person claiming immunity had already testified and completed his part of the bargain. (*Id.,* at pp. 915-916; see also *People* v. *Superior Court (Crook)* (1978) 83 Cal.App.3d 335, 339 [147 Cal.Rptr. 856].) In our case defendant never testified and he divulged nothing that could be used against him.

The trial court found no estoppel because defendant failed to establish that he detrimentally relied on any alleged promise of immunity. Again, substantial evidence supports this finding. During the meeting in which defendant's identity was revealed, both he and his attorney were told by the district attorney that no immunity would be granted and that defendant was a primary target of the investigation already underway.

▮ Defendant further argues that much of the evidence introduced at trial should have been suppressed as an illegal fruit of the immunity negotiations. He specifically points to the testimony elicited from his brother Chester Yu and information obtained from Dana Yu that was used to incriminate him. We find no merit to this contention.

---

[2]Penal Code section 1324 provides: "In any felony proceeding or in any investigation or proceeding before a grand jury for any felony offense if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and if the district attorney of the county in writing requests the superior court in and for that county to order that person to answer the question or produce the evidence, a judge of the superior court shall set a time for hearing and order the person to appear before the court and show cause, if any, why the question should not be answered or the evidence produced, and the court shall order the question answered or the evidence produced unless it finds that to do so would be clearly contrary to the public interest, or could subject the witness to a criminal prosecution in another jurisdiction, and that person shall comply with the order. [¶] After complying, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, that person shall not be prosecuted or subjected to penalty for forfeiture for or on account of any fact or act concerning which, in accordance with the order, he was required to answer or produce evidence. But he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order."

During two different hearings on this issue, the trial court specifically found that both of defendant's brothers had received the benefit of their bargains with the district attorney and that any information elicited from them could be used against defendant at trial. The court further determined that the prosecutor's promise not to use evidence obtained during the immunity negotiations if the bargaining fell through was not breached when information provided by Chester and Dana Yu was used against defendant. Further, the court found that during the negotiations the prosecution obtained nothing from defendant which could be used against him. All of the evidence either came from an independent investigation or from Chester and Dana.

Nor was the conduct of Attorney Walker subject to any criticism. It appears that defendant and his brothers sought out Mr. Walker to act as their intermediary in obtaining immunity and/or a juvenile court disposition for the younger Chester who had driven the car. Dana's role in stealing the car for use in the planned attack was in fact "peripheral."

It appears clear that Mr. Walker was misled by defendant as to the true nature of his role in the scenario. The story as portrayed to Walker and as relayed to Levine would present no apparent conflict between the three brothers.

Since it was the machinations of defendant that brought about the negotiations between Walker and Levine, he cannot now be heard to complain that he suffered any detriment therefrom.

In fact, at the meeting between the Yu brothers, Walker and Levine, it appears that defendant said nothing but remained quite silent while the facts were outlined by the other participants. We discern no untoward conduct on the part of either Walker or Levine.

■ Defendant next argues that if the agreement for immunity is not enforced, he is entitled to specific performance of a later plea bargain to one count of second degree murder.

At a January 5, 1979, evidentiary hearing defendant contended that the prosecution had agreed to a plea bargain to one count of second degree murder. The prosecutor, on the other hand, contended that any plea offer had been withdrawn before it was accepted.

The trial court found that the district attorney did make a plea bargain offer on April 25, 1978, modified on May 30, 1978, and that it was accepted by defendant through counsel on September 1, 1978. The court also found that the district attorney had led the defendant to believe the offer would remain open up to and including the time of the pretrial conference, i.e., September 1, 1978.

Therefore, any attempt to withdraw the offer before that time elapsed was invalid. The court ruled that defendant's acceptance of the offer in September 1978, constituted a binding agreement that could not be rescinded.[3]

At the same time, however, the judge made clear that any plea entered was *conditional* and that "it would rest in the sound discretion of the court taking the conditional plea as to whether or not that court would approve the conditional plea."

Later that same day, the matter was transferred to another court, and defendant entered his plea to one count of second degree murder. The case was then referred to the probation department for a presentence report.

On February 23, 1979, the time set for sentencing, the court, after reviewing the probation report, refused to accept the plea to second degree murder and rejected any idea of dismissing the remaining counts. The plea was then vacated and set aside. Subsequently, defendant challenged the court's order by filing an unsuccessful petition for writ of prohibition.

The district attorney argues that the court erred in finding a binding plea bargain agreement in the first place and that even if there was such an agreement, the court had the power to set aside the plea. We agree.

■ The process of plea bargaining has received statutory and judicial authorization as an appropriate method of disposing of criminal prosecutions. (*People* v. *Alvarez* (1982) 127 Cal.App.3d 629 [179 Cal.Rptr. 706]; *People* v. *Orin* (1975) 13 Cal.3d 937 [120 Cal.Rptr. 65, 533 P.2d 193].) ■ It is well settled that a plea bargain is a tripartite agreement which requires the consent of the defendant, the People and the court. (*People* v. *Woodard* (1982) 131 Cal. App.3d 107, 110 [182 Cal.Rptr. 254].) A court has no authority to impose a bargain over the People's objection. (*Id.,* at p. 110.)

■ The cases which estop the prosecution from rescinding a plea agreement and require specific enforcement of the bargain are those in which the defendant has suffered some detriment in relying on the agreement. (See *People* v. *Brunner, supra,* 32 Cal.App.3d at pp. 915-916; *People* v. *Barnett* (1980) 113 Cal.App.3d 563, 574 [170 Cal.Rptr. 255].)

---

[3]The elements of the agreement, as found by the judge, were as follows: ". . . the Defendant, Tom Yu, would offer to plead guilty to one count of murder as charged in the [Indictment] on file herein, . . . that the degree of the murder would be fixed as murder in the second degree, that the mid term as it then existed of six years would be imposition of sentence on the plea of guilty to murder, the degree of which was fixed as second degree; that the Defendant would admit the firearm allegation pursuant to Section 12022(a) of the Penal Code; that an additional one year term would be—imposed as an enhancement; that the Defendant would not be compelled to testify against any other person; . . ."

The crucial factor in determining if the prosecution may withdraw a plea bargain offer or if the offer having once been made and accepted is specifically enforceable by a defendant is whether the defendant has given up a valuable constitutional right or otherwise detrimentally relied on the promises made in the plea bargain. (*People* v. *Barnett, supra.*)

In our case defendant cannot claim that the People were estopped from withdrawing the offer, because he can point to no harm suffered as a result of the plea negotiations. Here, defendant's guilty plea was withdrawn and he proceeded to trial.

Assuming arguendo that a valid plea bargain agreement had been reached by both parties, it is clear that the trial court has the power to reject the bargain in the sound exercise of its discretion. (*People* v. *King* (1981) 123 Cal.App.3d 406 [176 Cal.Rptr. 507]; *People* v. *Johnson* (1974) 10 Cal.3d 868, 873 [112 Cal.Rptr. 556, 519 P.2d 604]; Pen. Code, § 1192.5.) A trial court may refuse to accept a bargain which it considers not to be in the public interest. (*People* v. *King, supra,* 123 Cal.App.3d at p. 408.) Furthermore, a court is entitled to withdraw its tentative or conditional approval of the bargain upon further consideration.[4] (*Id.,* at p. 408; see also *People* v. *Beasley* (1970) 5 Cal. App.3d 617, 624, fn. 3 [85 Cal.Rptr. 501].) In the case at bench, the court specifically found that it would not be in the public interest to accept defendant's plea and withdrew its approval of the bargain after digesting the contents of the presentence probation report. Defendant had been warned that the plea was conditional and that it could be subsequently rejected by the court. There was no error.

Defendant next urges us to reverse the judgment on the ground that he was denied a postindictment preliminary hearing. We refuse.

In *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 594 [150 Cal.Rptr. 435, 586 P.2d 916], our Supreme Court held that equal protection of the law requires that an indicted defendant be accorded a postindictment preliminary hearing, but due to prior official reliance upon former procedures the change was made applicable only to "those indicted defendants who have not entered a plea at the time this opinion becomes final." (*Id.,* at p. 594.)

The high court's decision in *Hawkins* was filed November 9, 1978, and became final on December 13, 1978. The record in the instant case reveals that

---

[4]Penal Code section 1192.5 provides in part: "*If the court approves of the plea, it shall inform the defendant prior to the making of the plea that (1) its approval is not binding, (2) it may, at the time set for the hearing on the application for probation or pronouncement of judgment, withdraw its approval in the light of further consideration of the matter, and (3) in such case, the defendant shall be permitted to withdraw his plea if he desires to do so.*" (Italics added.)

defendant entered a not guilty plea to each count of the indictment and denied the armed allegations on July 6, 1978. On these facts, defendant was not entitled to a postindictment preliminary hearing. Defendant's various contentions in this regard have been unanimously rejected by the appellate courts of this state and the facts of this case do not justify a different result here. (*People* v. *Teron* (1979) 23 Cal.3d 103, 112, fn. 3 [15] Cal.Rptr. 633, 588 P.2d 773]; *Sherwood* v. *Superior Court* (1979) 24 Cal.3d 183, 186 [154 Cal.Rptr. 917, 593 P.2d 862]; *People* v. *Pangelina* (1981) 117 Cal.App.3d 414, 417, fn. 1 [172 Cal.Rptr. 661]; *People* v. *Martin* (1982) 135 Cal.App.3d 710, 723-724 [185 Cal.Rptr. 556].)

Defendant further argues that because there is no indication in the record that a quorum of grand jurors heard all the evidence against him, the indictment was invalid and should have been set aside. This contention goes unsupported by either the facts or the law.

It is well settled that in the absence of evidence to the contrary, it will be presumed that the grand jury was regularly and legally selected, impanelled, organized and sworn and that its proceedings were lawful and regular. (*People* v. *Meraviglia* (1925) 73 Cal.App. 402, 407 [238 P. 794]; *People* v. *Dale* (1947) 79 Cal.App.2d 370, 375 [179 P.2d 870]; see also Evid. Code, § 664.) **(13)** Likewise, "[t]he presenting of the indictment, endorsed as a true bill by its foreman to the court by the grand jury in its own presence, indicates the regularity of all the prior proceedings of that body in the matter." (*People* v. *Tennant* (1939) 32 Cal.App.2d 1, 9 [88 P.2d 937]; see also *People* v. *Fujita* (1974) 43 Cal.App.3d 454, 477-478 [117 Cal.Rptr. 757].) Where the indictment indicates the presence and concurrence therein of a "quorum," it need not *affirmatively show* that the requisite number of members voted. (*People* v. *Dale, supra,* 79 Cal.App.2d at p. 375.)

When these principles are applied to the case under review, we can only conclude that the proceedings of the grand jury were properly conducted. Defendant has made no showing to the contrary, apparently relying upon the erroneous assumption that the indictment must show the actual number of persons present and voting rather than merely indicating the presence and concurrence of a "quorum." On the record before us, we must presume that the foreman would not have indorsed the indictment as a true bill if the proper procedures had not been observed. (*People* v. *Dale, supra,* at pp. 375-376.)

Defendant's next claim of error relates to the various changes in venue that occurred during the pendency of the case. He specifically asserts that because he was not allowed to return to San Francisco while awaiting trial, he was denied the effective assistance of counsel in preparation of his defense. This argument is without merit.

Because of the publicity involving the killings, defendant requested a change of venue from the San Francisco area. The motion was granted and venue was first changed to Fresno County and then to Santa Barbara County. Defendant was transferred from San Francisco to Fresno and then to Santa Barbara upon the granting of each of his motions. Defendant filed several motions requesting to return to San Francisco until trial commenced. Each such motion was denied.

Transfer of a defendant to the new county is required upon a change of venue under Penal Code section 1036 which states: "If a defendant is incarcerated and the court orders a change of venue to another county, the court shall direct the sheriff to deliver the defendant forthwith to the custody of the sheriff of such other county."

Defendant presents no facts to show that his right to effective assistance of counsel was impaired. He alleges merely an inconvenience and has failed to make any showing of prejudice.

Defendant further argues that *Griffin* error occurred during the jury selection process when the prosecutor purportedly commented upon his right to remain silent. Defendant's position is untenable.

During voir dire, the prosecutor explained that a defendant has a right to remain silent and the privilege not to testify or give any self-incriminating evidence.[5] He further explained that other witnesses also have the same privilege.

Although defense counsel objected to these statements, he failed to articulate any legal ground. In reply, the prosecutor stated that he mentioned the privilege against self-incrimination in order to explain why immunity had to be granted to some of the prosecution witnesses and to ask if any of the jurors disagreed with the practice of granting immunity. The defendant's objection was overruled.

A party is precluded from raising an issue on appeal unless he makes a specific and timely objection below. (Evid. Code, § 353.) Defendant stated no specific grounds for the objection. Even assuming that there was a specific and timely objection below, the prosecutor's comments did not rise to the level of prejudicial misconduct mandating a reversal of the judgment.

[5]The statements defendant complains of are the following: "Now, Mr. Sheridan discussed at considerable length the defendant's privilege—any defendant's privilege against self-incrimination; not having to present evidence or testify. [¶] I want to talk about that, not as it relates to the defendant, but as it relates to a witness in this case. What he is talking about is the Fifth Amendment, the privilege against self-incrimination; you can't be compelled to give evidence that would incriminate yourself. [¶] That is the constitutional right the defendant has: that he cannot be compelled to testify; he doesn't have any burden of proof; he doesn't have to present any evidence."

█ It is a well settled rule of law that a prosecutor is prohibited from making any comment on the failure of the criminally accused to testify in his own behalf. (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]; see also *People* v. *Jackson* (1980) 28 Cal.3d 264, 304 [168 Cal.Rptr. 603, 618 P.2d 149].) █ However, here the prosecutor did not comment on defendant's failure to take the stand and testify, he merely explained to the prospective jury members that any person has the right to remain silent. There was no indication that the prosecutor was asking the jury to draw an adverse inference against the defendant should he fail to testify. " '[I]ndirect, brief and mild references to defendant's failure to testify, without any suggestion whatever that an inference of guilt should be drawn therefrom, are uniformly held to constitute harmless error . . . .' " (*People* v. *Frausto* (1982) 135 Cal.App.3d 129, 146 [185 Cal.Rptr. 314], quoting *People* v. *Jackson, supra,* 28 Cal.3d 264, 304.)

Here, the comment on the defendant's right to remain silent was made only once during voir dire at the beginning of a very lengthy trial before the jurors even knew whether or not defendant would testify. Under these circumstances, we cannot find that the comment influenced the verdict in any way. Here the error neither served to "fill an evidentiary gap" nor "touch a live nerve in the defense." (See *People* v. *Modesto* (1967) 66 Cal.2d 695, 714 [59 Cal.Rptr. 124, 427 P.2d 788].)

█ Defendant alleges that the trial court abused its discretion in admitting evidence of an uncharged murder that he allegedly ordered to be committed. Defendant claims that this evidence was irrelevant. He further argues that even if this evidence is relevant, it should have been excluded because it constitutes evidence of an uncharged crime which is being used to prove his propensity to commit the offenses alleged in the indictment. Moreover, defendant contends that even if this evidence is not inadmissible for the reason stated above, it should have been excluded because its prejudice far outweighs its probative value. We disagree.

The evidence that is being challenged concerns the death of one Louie, a member of the Wah Ching gang. At trial Gan Wah Woo, a prosecution witness, testified that defendant ordered him to kill Louie. Woo claimed that he went out to kill Louie on three separate occasions but each time came back with a fake excuse as to why he could not commit the crime.

Woo further testified that he was a member of the Joe Boys and that when defendant gave an order, the gang members were expected to obey. Dr. Stephens, the chief medical examiner, testified that Louie had been killed by several gunshot wounds to the head. Two photographs of Louie's body were admitted into evidence. The identity of Louie's killer was not known.

All relevant evidence is admissible unless there is a positive rule excluding it. (Evid. Code, § 351.) Relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence . . . ." (Evid. Code, § 210.) The test of relevancy is whether the evidence tends, logically, naturally, or by reasonable inference to establish a material fact, not whether it conclusively proves it. (*People* v. *Peggese* (1980) 102 Cal.App.3d 415, 420 [162 Cal.Rptr. 510].)

One of the disputed facts at trial was, of course, defendant's position in the Joe Boys. Woo's testimony tends logically and naturally to prove that defendant was a primary force in the gang and was considered to be a leader. Evidence of Louie's death tends by reasonable inference to establish the fact that when defendant gave an order it was carried out.

Defendant argues that the evidence of Louie's actual death is inadmissible since no evidence was offered that connected the crime to his alleged order to kill. Defendant was free to argue that the order to kill Louie and Louie's actual death were mere coincidences. However, this does not make the evidence irrelevant, rather it goes, as the trial court ruled, to the weight of the evidence, not its admissibility. The trial court is vested with wide discretion in determining relevance. (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) There was no abuse of discretion here.

Furthermore, the fact that this evidence involved another crime does not make it inadmissible per se. As a general rule evidence of uncharged offenses is inadmissible when offered merely to prove a defendant's criminal disposition. (Evid. Code, § 1101; *People* v. *Hill* (1967) 66 Cal.2d 536, 556 [58 Cal.Rptr. 340, 426 P.2d 908].)

"It is settled that evidence of other crimes is ordinarily admissible despite the prejudicial effect where it tends to establish guilty knowledge, motive, intent or presence of a common design or plan." (*Id.,* at p. 557; Evid. Code, § 1101, subd. (b).)

As pointed out, *ante,* the evidence complained of went to prove a relevant fact, defendant's leadership position in the Joe Boys. This fact would tend to show that defendant participated in planning and indeed even ordered the Golden Dragon killings. Moreover, the fact that defendant had ordered a Wah Ching member's death goes to prove both motive and intent in this case.

Since the admission of uncharged offenses lies within the sound discretion of the trial court (*People* v. *DeRango* (1981) 115 Cal.App.3d 583, 589 [171 Cal. Rptr. 429]), we cannot say the court in the instant case abused its discretion.

As for defendant's argument that the evidence was substantially more prejudicial than probative, all evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."

"This balancing test [under Evid. Code, § 352] is necessarily particularistic, depending not upon mechanically automatic rules, but upon the trial court's consideration of the unique facts and issues of each case . . . ." (*People* v. *Scott* (1980) 113 Cal.App.3d 190, 198 [169 Cal.Rptr. 669], quoting *People* v. *Schader* (1969) 71 Cal.2d 761, 773-774 [80 Cal.Rptr. 1, 457 P.2d 841].)

If, as defendant contends here, there was no basis on which the jury could connect the defendant with the murder of Louie, then the evidence of Louie's murder could neither prejudice nor damage the defendant.

On the other hand, the evidence, tending as it did to prove that defendant ordered the death of Louie, was relevant and thus damaging to defendant on the issue of whether defendant ordered the death of other rival gang members at the Golden Dragon. To hold that the evidence was excludable as "prejudicial" would be to hold that evidence may be barred because it is *too relevant*.

█ We next consider defendant's claim that "the arming allegations were improperly submitted to the jury in conjunction with the Penal Code section 245(a) counts." The facts relating to this contention are as follows:

As indicted by the grand jury, defendant was charged in 11 separate counts with violating Penal Code section 245, subdivision (a). Each count was framed in the language of the statute, to wit, that defendant committed an assault upon the person of another with a deadly weapon, *and by means of force likely to produce great bodily injury*. Arming allegations pursuant to Penal Code section 12022, subdivision (a) were alleged as to every charge in the indictment.

Prior to trial the prosecutor moved the court to strike all references to a deadly weapon in the 11 assault charges. Over defense objection, the motion was granted. Defendant now argues that the district attorney lacked the authority to amend the indictment and that, in any event, the assault charges were not subject to the enhancement provisions of section 12022, subdivision (a). We find these contentions to be not only meritless, but irrelevant as well.

Although an indictment may be amended by the prosecution under the authority of Penal Code section 1009 (see Witkin, Cal. Criminal Procedure (1963) Proceedings Before Trial, §§ 210-214, pp. 198-204), the amendments sought by the district attorney and allowed by the trial court in the instant case were unnecessary.

Penal Code section 12022, subdivision (a) provides for enhancement of the punishment of anyone armed with a firearm during the commission of a felony offense. It specifically exempts, however, those crimes in which "such arming is an element of the offense." Defendant wrongly contends that assault with a deadly weapon falls within that exception. Since the term "deadly weapon" encompasses a variety of lethal instruments other than firearms, the use of a firearm is not an essential element of assault with a deadly weapon under section 245, subdivision (a). Accordingly, the punishment for that crime may be enhanced pursuant to section 12022, subdivision (a). (Cf. *In re Anthony H.* (1980) 108 Cal.App.3d 494, 498-499 [166 Cal.Rptr. 607]; *People* v. *Whitehouse* (1980) 112 Cal.App.3d 479, 484-485 [169 Cal.Rptr. 199]; *People* v. *Moreno* (1982) 128 Cal.App.3d 103, 109 [179 Cal.Rptr. 879].)

Finally, having conducted an independent review of the record, we summarily reject defendant's contention that the deputy district attorney, Hugh Levine, should have been recused from prosecuting the instant case following his announced intention to write a book on the Golden Dragon killings. We also find no merit in defendant's claim that he was improperly denied discovery of any personal memoranda compiled by Levine for use in writing his "contemplated" book. Since defendant made no request for an *in camera* disclosure of the alleged material, there has been no showing that these writings consisted of anything more than Levine's impressions, conclusions, opinions, or legal theories. Of course, such material constitutes "work product" and as such is not subject to discovery. (*People* v. *Moore* (1975) 50 Cal.App.3d 989, 994 [123 Cal.Rptr. 837].)

The judgment is affirmed.

Beach, J., and Gates, J., concurred.

A petition for a rehearing was denied June 16, 1983, and appellant's petition for a hearing by the Supreme Court was denied August 24, 1983.