Filed 5/15/14  P. v. Peterson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072521 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F01628) |
| v. | |
| MICHAEL J. PETERSON, | |
| Defendant and Appellant. | |

The jury found defendant Michael J. Peterson guilty of first degree murder and found true an allegation he used a deadly weapon (a knife), but not true a robbery-murder special circumstance, and the trial court found he had two prior serious felony convictions (both first-degree burglaries).  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17); 459, 667, subd. (a); 12022, subd. (b)(1).)  The trial court sentenced defendant to prison for 25 years to life for murder, consecutive to 11 years for the enhancements, and he timely appealed.

1

On appeal, defendant challenges two evidentiary claims. One was the admission of his statement to a nurse a few months after the killing to the effect that he had killed before. The other was the introduction of evidence of defendant's relationship to White supremacist groups. We find no prejudicial error and shall affirm the judgment.

**FACTS**

This was a cold case murder, solved by a DNA match.

On November 5, 1992, police arrived at John Arana's house, to find his body in the bedroom, with blood in various locations in the house. The kitchen sinks were filled with reddish water and contained items including knives, sexual lubricant, and homosexual pornographic magazines with Nazi symbols apparently drawn on them. The toilet had discarded bandages in it. There were no signs of forced entry.

A friend of Arana's testified he knew Arana sometimes combined cocaine use with sexual behavior. Arana's tenant, in a house behind Arana's, reported hearing blunt noises like something hitting the wall. Arana's TV, VCR, answering machine, wallet, and truck were missing. The truck was found three days later, wiped clean.

The pathologist found 28 stab wounds, from a knife five inches long or greater, but no hilt marks, which are typically caused when a knife with a hand guard is plunged fully into a body. In stabbings where a knife with no hand guard is used, the assailant's hand can easily slip off the handle and he or she is then cut with his or her own knife. A criminalist and a detective testified in accord. The pathologist and detective each described defensive cuts on Arana's hands and fingers. Arana's own sperm was found in his mouth and anus.

On the evening of November 4, 1992, defendant went to a hospital emergency room with injuries to his left wrist and a joint of his right index finger, claiming his wife had cut him with a butcher knife.

Marjorie Evert testified she was working as a nurse and peace officer at Deuel Vocational Institution, a state prison, on February 13, 1993, in the hospital, where

2

defendant was a patient.  Some patients were psychiatric cases, but she could not recall whether defendant in that group.  Defendant became very upset and angry when told it was not time for him to exercise, and he broke windows and said he was going to kill Evert when he got out, adding, "You're not the first and you won't be the last."  She had previously said the threat was made to staff consisting of herself and another nurse, not necessarily herself personally.  However, she took defendant's threat seriously.

Ultimately, a DNA match linked defendant to the crime scene.

On January 20, 2009, Sergeant Keller and Detective Jason went to Missouri to talk to defendant in a prison there.  When asked if he knew about any Sacramento murders, defendant said he had been a member of the "Nazi Low Riders" and witnessed two gang murders in 1990 or 1991, which he described.  One man was hit with a crowbar and put in a refrigerator because he had molested someone's niece, and a woman was choked for being a "rat."  He showed Keller a "bird" tattoo on his shoulder and said it was a Nazi Low Rider emblem.  He said that in 1991, the gang kidnapped and tortured him.  He denied homosexual activity.  He denied knowing Arana or anything about his killing.

At trial, defendant testified a White man named Terry Rae Cooper, whom he met at Loaves and Fishes--a services provider to homeless people--went with him to the parking lot of a bar on Broadway, where they first saw Arana.  Cooper suggested defendant could "turn a trick" with Arana to get money for cocaine.  After Cooper approached Arana, he drove Cooper and defendant to Arana's house, where defendant fell asleep on a couch.  Something woke him up, he went into the bedroom, and Cooper told him to "get the hell out of here" or "get back" and cut defendant with a knife.  Defendant grabbed a rag to wrap his hand, ran away, and went to the emergency room, telling the staff his wife had stabbed him.  He never heard from Cooper again and did not know about Arana's murder.  In 1993 he moved to Kansas City, where his mother lived.

Defendant also testified that in 1991 he had been beaten and sexually tortured by Nazi Low Riders, with whom he had associated while at the state prison in Susanville,

3

after which he did not associate with them.  He told Sergeant Keller that he "ran with" that gang, but did not say that he was a member.  He claimed he had not witnessed the murders he described to Keller, he was relaying "secondhand" information to him.  He admitted he had an "iron eagle" tattoo, a picture of which was shown to the jury.  He admitted that tattoo "could be construed as a White Power Tattoo."  He also described the SS lightning bolts as reflecting Aryan ideology and in the prison system they pertained to White supremacy, which was the ideology of the Nazi Low Riders.  Some of the symbols added to the homosexual magazines shown at trial were Nazi symbols, except a backwards swastika, but he denied drawing them, although he sometimes drew, and was good at art, stating he drew "much better than that."

Defendant did not remember threatening Evert, but he had been having bipolar "spikes," and was on suicide watch at the time, during which he "said stupid things like that all the time."  He denied being homosexual, but admitted he had engaged in oral homosexual conduct between seven and nine years prior to 1992.  When arrested on another matter in December 1992, defendant gave a false name and did not mention the stabbing incident.  He had several convictions involving moral turpitude in California and Missouri, including first and second degree burglaries, forgery, misdemeanor and felony thefts, and robbery.

In rebuttal, an experienced officer described fruitless efforts, via governmental and private databases, to find "Terry Rae Cooper," and he eliminated all persons named "Terry Cooper" as not matching the gender, age, or race defendant had described.  He also identified various photographs taken of the magazines found in the sinks, depicting men with Nazi symbols drawn on them.  DNA from the scene matched Arana or defendant, but no third parties.  A photograph of defendant's chest tattoo was admitted into evidence.

The People argued defendant wanted to steal from Arana and then tried to conceal evidence of having killed him by submerging evidence in water and the toilet.  Defendant

lied about his wounds to hospital staff, and lied to Detective Keller about being in the house. His DNA--and no one else's--was found in the house. Cooper never existed. Defendant was not comfortable with his homosexuality, which might be because of the Nazi Low Riders, yet he drew Nazi symbols on the pornographic images in the magazines and had a Nazi tattoo.

The defense emphasized the People's high burden of proof, and that defendant's DNA had *not* been found in the bedroom with Arana's body, but only in other areas of the house, and argued Arana was stabbed by Cooper, as defendant testified.

The jury rejected the robbery-murder special circumstance, but found defendant guilty of first degree murder with use of a knife.

## DISCUSSION

### I

### *Evert's Testimony*

The People moved in limine to introduce Evert's testimony containing defendant's admission that he had killed before. The People emphasized the close time between the killing (November 4-5, 1992) and the alleged threat (February 13, 1993).

The trial court agreed the evidence was admissible, referencing its closeness in time to the killing, and found it was substantially more probative than prejudicial, but cautioned the prosecutor to "limit the amount of detail" surrounding the incident. After Evert's testimony, following another defense objection, the trial court reiterated its ruling, finding the closeness in time of the threat to the killing was highly probative, and whether defendant actually meant the words to be taken as true was for the jury to decide.

On appeal, defendant contends the evidence was unduly inflammatory under state law, and violated his right to due process. We disagree.

A. *Forfeiture*

To the extent that defendant contends the evidence violated due process, rather than state-law evidentiary rules, the People contend the point is forfeited for lack of trial

5

objection.  Evidence Code section 353, subdivision (a)[1] requires "timely" and "specific" objections to evidence.  "The reason for the rule is clear--failure to identify the specific ground of objection denies the opposing party the opportunity to offer evidence to cure the asserted defect."  (*People v. Holt* (1997) 15 Cal.4th 619, 666; see *People v. Williams* (1997) 16 Cal.4th 153, 250 [due process claim not preserved due to lack of trial objection].)

But the trial court granted a request that all trial objections be deemed "Federalized[.]"  The granting of this inappropriate request muddies the record regarding the timeliness and specificity of *any* of the many objections voiced during this trial; accordingly, we shall reach the merits of defendant's due process claim.

B.  *Due Process*

As defendant concedes in his reply brief, he has preserved only the claim that the trial court committed state law error, which had the additional legal effect of violating due process.  (*People v. Partida* (2005) 37 Cal.4th 428, 433-439 (*Partida*).)  "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'  [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose."  (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920; see *People v. Kelly* (2007) 42 Cal.4th 763, 787; *People v. Steele* (2002) 27 Cal.4th 1230, 1246; cf. *Partida*, *supra*, 37 Cal.4th at p. 439 [even if evidence should be excluded under state law, its admission "results in a due process violation only if it makes the trial *fundamentally unfair*"].)

_____

[1] Undesignated statutory references are to the Evidence Code.

Here, the evidence was admissible under state law, and because there were permissible inferences the jury could but was not compelled to draw from it, it did not violate due process or render defendant's trial fundamentally unfair.

Relevant evidence has "any tendency in reason" of proving or disproving a material disputed fact. (§ 210.) Contrary to defendant's view, Evert's testimony meets this threshold standard, because the jury could, but was not required to, construe defendant's statement as an admission that he killed before, and that he was referring to Arana's death, not merely blustering or referring to a Nazi Low Rider killing, as defendant's briefing speculates.

Nor was this evidence unduly inflammatory so as to require exclusion. Section 352 provides in full: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"The two crucial components of section 352 are 'discretion,' because the trial court's resolution of such matters is entitled to deference, and 'undue prejudice,' because the ultimate object of the section 352 weighing process is a fair trial." (*People v. Harris* (1998) 60 Cal.App.4th 727, 736 (*Harris*).) " 'Prejudice' does not mean a result which is unfavorable, it means a result which is unfair." (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1109; see *People v. Yu* (1983) 143 Cal.App.3d 358, 377[" 'Prejudicial' is not synonymous with 'damaging.' "] " 'The prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)

As we have pointed out: "Evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167.) Moreover, "Trial courts enjoy 'broad discretion' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Id.* at pp. 167-168.)

In determining whether uncharged act evidence will be unfairly prejudicial, we typically consider: (1) the probative value of the evidence, (2) the comparatively inflammatory nature of the evidence, (3) the probability of jury confusion about how to use the evidence, (4) remoteness, and (5) consumption of trial time. (See, e.g., *Harris*, *supra*, 60 Cal.App.4th at pp. 737-741.) We consider each of these points in turn.

First, we note there is no challenge to the trustworthiness of the statement. (See, e.g., *People v. Cudjo* (1993) 6 Cal.4th 585, 607.) Evert testified she took the threat seriously. This made the evidence of defendant's statement highly probative of the fact that he had killed someone in the past.

Second, compared to the gruesome evidence surrounding the murder itself, this testimony was not *comparatively* shocking, such that it would tend to skew the jury's assessment of all of the other evidence of defendant's guilt. (Cf. *Harris*, *supra*, 60 Cal.App.4th at pp. 737-738 [jury's assessment of testimony about comparatively minor charged conduct was skewed by evidence of brutal, speculative, and extremely inflammatory uncharged conduct].) The threat evidence was comparatively benign.

Third, the evidence was not confusing: Assuming the jury credited Evert, it would either conclude defendant was boasting to frighten her, spoke out of a mental lapse, or

was making a sincere statement that he had killed.  Deciding which inference to draw from his statement would not be difficult or confusing for the jury.

Fourth, the prior incident, although "remote" as viewed from the time of trial, was very close in time to the murder, as the trial court pointed out.

Fifth, the evidence was not time-consuming, occupying less than 10 full pages of transcript, including cross-examination.

All of these factors militated in favor of admission of this evidence.

We also note that the prosecutor's argument emphasized the abundant *other* evidence of defendant's guilt, including his DNA in the house, the fact he had cuts consistent with hurting himself while stabbing Arana, defendant's prior record which cast doubt on his veracity, and the apparently missing items from the victim's house, showing a motive to steal.  Therefore this case is not one where strong evidence of a prior incident is used by the prosecution to leverage a weak case.  In short, we see no abuse of discretion in the admission of this evidence.

C.  *Harmless Error*

Moreover, given the other evidence, any error was harmless.  "As a general matter, the '[a]pplication of the ordinary rules of evidence' " does not amount to a due process violation, "[a]ccordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 [], and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension [citation]." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 (*Fudge*).)  In this case, the DNA matches, defendant's recent cuts after the killing, and lies at the hospital about how he got those cuts, the lack of evidence that "Terry Rae Cooper" existed, and defendant's flight to another state all show it is not reasonably probable the result would have been different had evidence of his statement to Evert been excluded.  (See Cal. Const., art. VI, § 13; *Watson, supra*, at p. 836.)

9

## II

### *Evidence of White Supremacy*

On appeal, defendant contends the trial was rendered unfair because of admission of evidence he was affiliated with White supremacist groups, had a swastika tattoo, and that Nazi symbols were found drawn on the magazines found in Arana's kitchen sink. We disagree.

Defendant objected to the relevance of his tattoos, and his understanding of other White pride tattoos, and argued that references to the Aryan Brotherhood and White power would be prejudicial. The trial court found the fact the magazines were found submerged in the sink was highly probative, reflecting an effort to destroy evidence, and stated defendant opened the door to the disputed evidence by testifying to crimes committed by Nazi Low Riders, including his own beating by them. After viewing defendant's tattoo outside the jury's presence, the trial court found a photograph of it admissible, because it circumstantially linked defendant to the attempted destruction of similar symbols drawn on the magazines.

Defendant later objected to the admission of photographic exhibits depicting homosexual pornography and White supremacy symbols. The trial court found sufficient evidence linked defendant to the magazines and the attempt to destroy them, which was probative on the issue of identity, and did not find they were unduly prejudicial. However, the trial court suggested giving the jury only photographs of the pages of the magazines bearing symbols, to lessen the impact. The trial court found defendant's own tattoo was relevant and "far outweighs any prejudicial effect," and offered to give a limiting instruction that defendant's association with White supremacy groups was not to be used to find he was a person of bad character or was predisposed to commit murder or robbery. The court gave the instruction, and defendant does not claim it was improper. Further, the prosecutor's argument emphasized that the jury should not consider defendant's beliefs as evidence of guilt.

10

On appeal, defendant faults trial counsel for not pressing further objections, specifically to Sergeant Keller's testimony about defendant claiming affiliation with the Nazi Low Riders, and in any event claims the admission of evidence of the Nazi symbols found on the magazines and defendant's own tattoo should have been excluded. We elect to reach the merits of his claims, and we find them unpersuasive.

*Someone* at the scene of the crime placed magazines with Nazi symbols drawn on photographs of men contained within them in the kitchen sink, along with other items of evidence, under water, in an arguable effort to destroy evidence.[2] The fact that defendant had some affiliation with a Nazi group, an admitted ability to draw, and a tattoo similar to those drawn on the magazines, tended to link him to the crime scene. Defendant's *beliefs*, which were never elicited in any detail, regarding the Nazi and White power movements, in and of themselves, were not relevant to the question of his guilt. But his affiliations and his markings were highly probative of his presence at the murder scene, and his participation in the murder and subsequent effort to hide evidence of the killer's identity in a manner highly inconsistent with that passive presence to which he testified. Under these circumstances, the probative value of the evidence exceeded its prejudicial effect, particularly given the limiting instruction to the jury. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 50.) Contrary to defendant's view, we see no reason why the jury would not follow this instruction as to this evidence. " 'In the absence of evidence to the

_____

[2] The record shows photographs from the magazines. One is a cover picture depicting a shirtless muscular man on with an "SS" (Schutzstaffel) lightning bolt runic symbol drawn on his upper right arm. Another is this same picture, with the man holding what appears to be a whip or other similarly shaped device. Another picture shows a different open-shirted, naked and muscular man, holding what appears to be a baton, also with "SS" bolts drawn on his upper left arm. A fourth shows a close-up view of a muscular left arm, possibly holding a baton, showing an anticlockwise swastika. A photograph of defendant depicts a standard Nazi party symbol, with an eagle over a swastika, near and above his left nipple.

contrary, the presumption [that the jury adhered to the limiting instructions] will control.' " (*People v. Zack* (1986) 184 Cal.App.3d 409, 416.)

Nor, as stated in part I, *ante*, would any error be prejudicial. Defendant was in the house, and cut his hand in the manner consistent with a killer using the type of unguarded knife found at the murder scene, then sought medical attention, lying to hospital staff about how he became injured. He then fled the state, without reporting the alleged "Terry Rae Cooper" incident. No third-party DNA was found at the scene, only defendant's and the victim's DNA. In such circumstances, it is not reasonably probable any error in the admission of this evidence caused actual prejudice. (See *Fudge*, *supra*, 7 Cal.4th at pp. 1103-1104.)

## DISPOSITION

The judgment is affirmed.


                                               DUARTE , J.


We concur:


 HULL , Acting P. J.


 HOCH , J.