Filed 12/16/15  P. v. Chavez CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD ARTHUR CHAVEZ,<br><br>    Defendant and Appellant. | H039575<br>(Santa Cruz County<br> Super. Ct. No. F18901) |

Defendant Richard Arthur Chavez killed his girlfriend Deanna Dudley by bludgeoning her head with a Maglite flashlight.  A jury found him guilty of second degree murder.  (Pen. Code, §§ 187, subd. (a), 189.)  The jury found true the allegation that defendant personally used a deadly or dangerous weapon.  (Pen. Code, § 12022, subd. (b)(1).)  In a bifurcated trial, the trial court found true the allegation that defendant had served a prior prison term.  (Pen. Code, § 667.5, subd. (b).)  The court sentenced defendant to an aggregate term of 17 years to life in prison.

Defendant raises four claims on appeal.  First, he contends the trial court erred by allowing his ex-wife to testify about several prior incidents of domestic violence. Second, he contends the evidence did not support a jury instruction regarding the right of self-defense when a defendant initiates the aggression or engages in mutual combat. Third, he argues the language of the self-defense instruction was vague and ambiguous.

And fourth, he claims the trial court erred by instructing the jury on contrived self-defense.

We conclude defendant's claims are without merit, and we will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*

1. *Overview*

In February 2010, defendant was a 40-year-old unemployed glass cutter. He lived in Felton with the victim, his girlfriend, 37-year-old Deanna Dudley. Defendant and Dudley had recently rented a room in a small one-bedroom house from Robert Schneider, who lived in the living room.

On the evening of February 28, 2010, defendant killed Dudley by striking her on the back of the head multiple times with a Maglite flashlight. Dudley's body was found on the floor of a storage room adjacent to the couple's bedroom. At trial, defendant argued that he had killed Dudley in self-defense. He claimed Dudley had attacked him with the Maglite, whereupon he took it away from her and struck her with it.

2. *Facts of the Offense*

In 2010, Robert Schneider lived on Rose Acres Lane in rural Felton. The property belonged to his grandparents. Schneider lived in a small, one-bedroom in-law unit, while his grandparents lived in a larger house adjacent to the in-law unit. A small tool shed with a television stood next to the in-law unit.

In January 2010, Schneider placed an ad on Craigslist to rent out the bedroom of the in-law unit. Defendant and Dudley responded to the ad and moved in on February 1. Their rental included the use of a small storage room adjacent to the bedroom. The storage room had its own door leading outside. Schneider used the living room of the in-law unit as his bedroom. The three of them shared the kitchen, the bathroom, and

2

laundry facilities as common areas. Schneider prohibited smoking in the house, but he allowed defendant and Dudley to use the tool shed as a smoking area.

On February 28, 2010, Schneider was "hanging out" in Santa Cruz with David Staico and Kim Arias. At around 8:00 p.m., they drove back to Schneider's house and smoked some heroin while sitting in a car parked on the road in front of the house. When they were done smoking heroin, they drove the car up to the house to go inside. Schneider saw defendant's and Dudley's bicycles outside, and the light in the shed was on.

At about 8:10 p.m., Schneider went inside while Staico and Arias stayed outside to smoke cigarettes. A short while later, Schneider was watching a basketball game on the television in the living room when defendant came out of his bedroom and went into the bathroom. At some point, Staico and Arias came inside to the living room. After defendant had been in the bathroom for about five or ten minutes, Schneider and Arias saw him in the hallway next to the living room. Defendant looked stunned and scared. At that point, defendant said to Schneider, "Can you come here? I need your help." Schneider followed defendant into the bedroom. Defendant took a drink from a can of beer. He appeared to be highly intoxicated and "not there at all." Defendant said, "I need you to call 911." Schneider asked defendant where Dudley was. Defendant said he and Dudley had gotten in a fight and Dudley had attacked him.[1]

Schneider opened the door of the storage room and saw Dudley lying face down on the floor. There was a large hole in the back of her head and blood all around her. She was unresponsive and her breathing resembled a muffled snore. Schneider ran back into the living room and called 911. The dispatcher instructed Schneider to press a towel against the back of Dudley's head. Schneider relayed the instruction to defendant, and

---

[1] On cross-examination, Schneider indicated that when he had recounted this statement to investigators, he told them, "[Defendant] said we got into a fight and something like this had happened before or something."

3

defendant applied a towel to the back of Dudley's head. Schneider remained on the phone with the dispatcher and described Dudley's injuries. At some point, Schneider noticed a black, foot-long Maglite flashlight standing on a desk in the storage room. After Schneider had been on the phone for about ten minutes, the dispatcher told him the police were on their way. He opened the front door and saw a sheriff's car driving by, whereupon he went outside to flag it down.

Deputy Sheriff Kristopher Koenig arrived at the property at 8:46 p.m. He entered the storage room through the exterior door. The storage room was long and narrow—three feet ten inches wide and fourteen feet nine inches long. Koenig found Dudley lying face down on the floor with a large pool of blood around her head and blood spatter on the walls around her. Dudley was exhibiting agonal breathing, indicating that her brain stem was shutting down. Defendant was kneeling over her, holding a wad of blue paper towels to the back of her head. When Koenig asked him what happened, defendant said, "I hit her. I'm going to jail."

Koenig started moving items out of the storage room to make room for paramedics to treat Dudley. These items included boxes, ashtrays, and a desk that was sitting too close to Dudley. Koenig noticed a black Maglite flashlight standing upright on the corner of the desk before he moved it. He took the flashlight out of the room and set it on a wooden entertainment stand resting just outside the doorway. As Koenig was moving the flashlight, defendant said he had used the flashlight to hit Dudley. Defendant said he had gotten into an argument with Dudley and that "she came after him." He said he pushed her away, but she came back towards him again, so he hit her with the flashlight he was holding in his hand. He said he hit her in the back of the head five or six times. At that point, defendant was crying and upset. He said that after he hit Dudley, he was talking to her, telling her he was sorry, to "hang in there," and that everything was going to be fine.

Several firefighters and paramedics then arrived, together with a second officer. The firefighters took over care of Dudley and defendant left the room. Koenig saw one

4

of the firefighters pull the paper towels off the back of Dudley's head. A flap of skin had peeled off her head and Koenig could see her skull. He could also see a contusion on the base of the back of her neck approximately one inch by three inches in size. The firefighters immobilized Dudley's spine and neck and rolled her onto a backboard to prepare her for transportation. Another officer took defendant into custody. Before the firefighters and paramedics could move Dudley out of the room, she stopped breathing. The paramedics attempted to restore her breathing and moved her to an ambulance. Dudley suffered cardiac arrest before the paramedics could drive the ambulance away. The paramedics attempted to revive Dudley and observed a pulse while en route to the hospital, but she was pronounced dead at the hospital.

After Dudley was taken away, Koenig began examining the rest of the crime scene. Koenig observed that a light was on in the tool shed, and the television was tuned to the Winter Olympics. There was a television in the bedroom as well, which was also tuned to the Winter Olympics. Koenig separately interviewed Schneider, Arias, and Staico. He then drew a sketch of the crime scene to memorialize the location of the objects in the storage room when he had first arrived. The next day, Koenig and another officer attempted to reconstruct the original placement of the items in the storage room.

Deputy Sheriff Michael Matranga was the second officer to arrive at the scene. He arrived soon after Koenig. Matranga saw defendant kneeling over Dudley. Defendant smelled strongly of alcohol. When defendant left the storage room, Matranga instructed him to sit on the steps of the front door. Defendant complied. He then covered his face with his hands and began to cry uncontrollably. When Matranga asked defendant what had happened, defendant said he and Dudley had gotten into an argument over the Olympics. Defendant said Dudley had come at him with a flashlight, whereupon he took the flashlight from her and hit her in the head four or five times. Defendant added: "I shouldn't have done that to her. I hope she's okay." Matranga then handcuffed defendant and placed him the back of a patrol car.

5

Matranga observed blood spatter and dried blood on defendant's body and clothing. Defendant had a linear red mark across the bottom of his right wrist, and a U-shaped mark higher up on his wrist.

One of the firefighters who treated Dudley observed bruising on her hands and neck. The firefighter also observed scrapes on her shoulder and arm area, in addition to her head injuries. Photographs of Dudley showed bruising in areas from her shoulder down to her forearm. Defendant told firefighters he had hit Dudley three or four times with a flashlight.

Defendant gave a statement to investigators in an interview room at the sheriff's office. At trial, the prosecution played a portion of a video of the interview, and the jury was given a transcript. At the start of the video, while defendant was alone in the interview room, he was crying and put his head down on the table. When questioning began, defendant answered most questions. But when investigators told him Dudley had died, he began crying again and put his head down on the table. Defendant then said, "I think I'm in shock. I am just now fucking in total shock."

Investigators took photographs of defendant's hands prior to the interview. The photographs showed no scratches on his wrists. In the video, defendant could be seen rubbing his hand underneath the table for a period of several minutes while he was alone in the room. He repeatedly pulled his hands out from underneath the table and looked at his wrists. As we discuss later in Section II.C., it appears defendant could have been trying to injure his wrists to support a claim of self-defense.

3. *Forensic Evidence*

The Maglite flashlight found on the desk tested positive for blood. The prosecution's forensic expert also testified there was hair embedded in the flashlight. A swab taken from the bathroom sink also tested positive for blood.

The prosecution's expert performed a crime scene reconstruction based on the blood spatter evidence found in the area of Dudley's body. The expert opined that the

source of the blood—the back of Dudley's head—was less than two feet above the floor when it was struck.

The parties stipulated, among other things, that: (1) DNA tests of the blood found in the bathroom sink showed three contributors, one of which was male, but no further information could be obtained; (2) Dudley's DNA was found on the Maglite flashlight; (3) defendant's blood-alcohol level at 2:52 a.m. on March 1, 2010, was 0.02 percent; (4) a toxicology screen of defendant's blood showed the presence of cyclobenzaprine (a muscle relaxant) and verapamil (an anti-arrhythmic and anti-hypertensive agent); (5) a second toxicology screen of defendant's blood was negative for cyclobenzaprine but positive for verapamil at a level of 0.017 milligrams per liter; and (6) fingerprints could not be taken from the flashlight due to the amount of blood on it.

4. *Autopsy*

Dr. Richard Mason, a forensic pathologist for the Sheriff-Coroner's office, performed an autopsy of Dudley's body. Dudley weighed 146 pounds and was five feet two inches tall. Dr. Mason observed bruising over her eyes, a blunt instrument wound on her right temple, a rim of abrasion around the neck, and a large laceration on the back of her head. Based on the nature of the laceration on the back of Dudley's head, Dr. Mason opined that she had been struck multiple times with a heavy, blunt instrument. He also opined that the abrasions around the neck were caused by "some sort of ligature device" such as a cloth, wire, or rope. These abrasions could have been caused by someone grabbing her shirt from behind and pulling on it. He opined that the injury to the front of her face was caused by a rod or tubular-shaped instrument. He also found a small abrasion on her right lower lip and bruises on the outside of her shoulders. Dudley's left hand was bruised and swollen—an injury that was inflicted contemporaneous with the fatal injuries. Dr. Mason opined that the cause of death was cerebral edema—a swelling of the brain that occurred as the result of force and trauma. He estimated that Dudley died within a few minutes after receiving the head injury.

7

5. *Prior Incidents Between Defendant and Dudley*

a. *John Bradley*

John Bradley lived as a roommate with defendant and Dudley for several months in 2009 and 2010, when they lived in Boulder Creek. Bradley testified that defendant and Dudley "tended to get angry" when they were drinking alcohol. He said defendant would get suspicious or jealous of Dudley, and would become impatient or short-tempered. He said defendant would refer to Dudley as a "slut-bitch-whore," as if that term were one word. Defendant told Bradley that, when Dudley was drinking, she would "go with anybody" or would consort with people from prior relationships.

Late one night while Bradley was in bed, he heard what sounded like a young girl's voice saying, "Stop it, leave me alone, quit, let me go." This was accompanied by noises of a scuffle or someone running outside the house. When he got up to investigate, he saw Dudley and defendant come indoors. Bradley realized he had heard Dudley talking, but not in her normal voice. Defendant and Dudley were intoxicated, and they began wrestling as if it were a game. At one point, they were on the floor, and defendant was on top of Dudley holding her arms down. Defendant gave Bradley "kind of a sheepish look," winked at him, and said "I'm being assaulted." Defendant said, "She packs quite a wallop." Dudley made a fist and pointed to her bicep. Bradley thought it was "some odd drunken antic" or "a silly skit." The next day, Bradley saw finger marks or a hand imprint on Dudley's neck. Bradley witnessed them arguing verbally on other occasions, but he never saw them engaged in any other physical violence and he never saw defendant strike Dudley in any way.

b. *Heather Miller*

Heather Miller was good friends with Dudley between 2000 and January 2010, at which time Miller moved to another state. Miller testified that Dudley had very low self-esteem, and that she sought men who were violent or who would abuse her.

8

Miller had a cordial relationship with defendant, who worked for Miller occasionally, but they did not spend time together socially. Defendant was usually intoxicated when she saw him. She saw Dudley drink as well, but not on a daily basis. Miller said Dudley could hold her liquor, but "she would have an attitude." She testified that both defendant and Dudley used prescription drugs such as Vicodin and Soma. Miller also used Vicodin and Soma. She once saw defendant taking pills out of her purse.

Miller observed bruises, bite marks, and choking marks on Dudley's body while Dudley was dating defendant. Miller also saw fingerprint and thumbprint marks on both sides of Dudley's neck on three different occasions. And she saw a human bite mark on Dudley's right shoulder blade. Miller also testified that she saw ring-shaped marks on Dudley's bicep, as if she had been held. Once, when Dudley took off her shirt while they were doing laundry, Miller saw dark bruises on her lower back area. Miller frequently saw dark bruises on Dudley's shins as well. Miller also testified that she had seen Dudley and defendant argue loudly. Defendant once told Miller he had slapped Dudley because he had been drinking and she had taken the last Vicodin.

Shortly before Miller moved out of state, defendant appeared at her door at 2 a.m. in a drunken, emotionally unstable condition. Defendant was initially crying, but quickly became furious. He said Dudley had been flirting with someone at a bar. Defendant, speaking in a focused and intent manner, told Miller that if he could not stay at Miller's house that night, he was going to go home and kill Dudley. Miller tried to talk him down and allowed him to stay at her house for the night. Several hours later, she heard defendant leave. About an hour later, Miller called Dudley and told her to get out of the house. Dudley was scared and crying. Miller could hear scuffling, and Dudley said defendant was strangling her. Within the next two or three days, Miller saw fingerprint and thumbprint marks on Dudley's neck. Miller testified, however, that she never saw defendant hit or strike Dudley.

6. *Prior Incidents Between Defendant and Other Women*

    a. *Linda Berry*

Linda Berry was married to defendant from 1998 to 2000. She first met him at a Rainbow Gathering in 1994. The couple bore a daughter in 1996 and a son in 1998. Defendant drank between six and twelve beers a day. When defendant drank a lot, he would lose his temper more easily and would become violent and unpredictable.

Berry testified to numerous acts of domestic violence by defendant. In 1995, Berry and defendant were living together in Albuquerque. They got into an argument, and defendant shoved Berry from a standing position down onto a couch. Berry landed on a dog who had been sleeping on the couch. The startled dog bit Berry. On another occasion, defendant and Berry were walking in downtown Albuquerque when Berry recognized a former boyfriend. Berry hugged the man, causing defendant to become jealous. When they got home, defendant questioned Berry about the man, and the couple got into a fight. While Berry was lying on the bed, defendant got on top of her and began choking her to the point where she could not breathe. Berry was pregnant at the time.

The couple then moved from Albuquerque to Moriarty, New Mexico. Berry was driving a broken-down Subaru when she attempted to pull onto a highway. Defendant was a passenger in the car. The car lost power, and they almost got into an accident. Defendant then hit Berry on the right side of the face with his fist while holding a bar of soap, causing Berry to suffer a black eye. On another occasion, Berry left some soap in defendant's coffee mug. Defendant became upset when he drank coffee from the mug, whereupon he threw the hot coffee onto Berry who was still pregnant at the time.

The couple then moved to a rural location in the Manzano Mountains of New Mexico. Following an argument, Berry attempted to get into a truck to leave the residence. Before Berry could drive away, defendant opened the hood of the truck and pulled out some wires, disabling the vehicle. When Berry left on foot, defendant warned her that if she brought any other man back to assist her, defendant would kill that man.

10

On another occasion, the couple got into an argument while outside the house, and defendant slammed Berry into a rock wall on the house's exterior. Berry gave birth to their daughter a week later.

The couple then moved to South Dakota to live with Berry's parents. In the midst of an argument, defendant shoved Berry into a wall. The couple then moved to Newark, California, to live with defendant's parents. After yet another argument, defendant head-butted Berry. Berry divorced defendant in 2000.

b. *Betina Sander*

Betina Sander met defendant at a swimming hole in Santa Cruz in the fall of 1999. They dated until early 2001 and lived together part of the time. Defendant drank at least a six pack of beer every night. Sander testified to several incidents in which defendant behaved aggressively or violently.

The couple had been living together for several months in Ben Lomond when defendant began to become domineering. In August 2000, the couple moved to South Dakota. They got into an argument during which defendant got within inches of Sander's face and began screaming loudly. Defendant was calling her names like "cunt," "bitch," and "whore." In the course of the argument, defendant put his hands on Sander and shoved her violently toward a wall. On another occasion, defendant and Sander were camping in a tent in the Black Hills of South Dakota. They got into an argument while they were inside the tent. Defendant called her names and accused her of being rich and spoiled. When Sander tried to crawl out of the door of the tent, defendant grabbed her legs and pulled her back into the tent.

Sander later moved to Germany to teach English. Defendant went to Germany to visit her in December 2000. The couple got into another argument, and defendant got within inches of Sander while shouting at her in a threatening manner. Defendant angrily shoved her into a wall. On another occasion, defendant forged Sander's signature on two checks.

11

c. *Lisa Couser*

Couser met defendant in South Dakota in 2005. The two began dating and defendant moved into Couser's trailer home with her three children. Defendant was drinking a twelve-pack of beer every day. Couser testified to several acts of aggression by defendant.

Defendant punched two holes in the wall of Couser's residence. During an argument with Couser's daughter's boyfriend, defendant picked up a metal folding chair and slammed it on a table. In another argument between defendant and the boyfriend, defendant shoved Couser out of the way, causing her to fall onto a chest freezer in her kitchen. On another occasion, Couser was trying to get to the living room of the trailer to call the police, but defendant physically blocked the hallway to prevent her from getting to the phone.

d. *Ginny Adams*

Ginny Adams is defendant's younger sister. Adams testified that, at one time, defendant had a reputation for violence. Adams recalled a conversation she had with defendant on the phone in 2008 or 2009. Defendant told Adams he had gotten into a fight with someone. Defendant said he had maimed and almost killed the man. On cross-examination, Adams testified that defendant said the man had attacked defendant's friend with a bottle. Defendant beat up the man in his friend's defense. Defendant needed to talk to Adams about it because he felt ashamed. The incident occurred in the 1990s.

Adams described another incident at their father's house in Newark on Christmas Eve in 1998. Defendant had been drinking and got into an argument with their father over the presence of another guest. Defendant and his father were arguing while inches apart, and defendant shoved his father. Adams physically intervened because she was concerned defendant might become violent.

12

About two or three weeks before defendant killed Dudley, Adams got a phone call from defendant. Defendant was crying and hysterical. He asked Adams to come pick him up. Defendant said he and Dudley had been arguing, and Dudley had hit him in the head with a glass ashtray. Defendant said he was bleeding and wanted to "get away from the whole situation" so nothing else would happen. Adams' husband picked up defendant and he stayed at Adams' house for two or three days.

On February 24, 2010, at 11:16 p.m., defendant sent a text to Adams stating, "She hit me. She will kill me." But Adams testified she never witnessed any physical acts of violence between defendant and Dudley.

7. *Other Prosecution Evidence*

Dudley's mother testified that, after Dudley's death, she discovered Dudley's handwritten journal among her belongings. A journal entry dated February 3, 2010, stated, "I believe I've become his personal punching bag emotionally and physically. I asked him what was next when he gets tired of pushing me around, will he start hitting me."

The parties stipulated that defendant had suffered convictions for: felony grand theft in 2007; two counts of burglary in 2006; and felony grand theft in 2006.

8. *Defense Evidence*

a. *Deputy Sheriff Jalon Harris*

Deputy Sheriff Jalon Harris conducted follow-up interviews of Kim Arias and John Bradley. Harris testified that Arias told him she and possibly others had used the bathroom at Schneider's house the night of the offense. Arias also told Harris that after defendant and Schneider went into defendant's bedroom, they came back to the living room where defendant asked Schneider to call the police.

Harris questioned Bradley about the wrestling incident between defendant and Dudley. Bradley told Harris that Dudley was throwing objects at defendant during the

13

incident, and that Dudley tackled defendant and started hitting him with her fists. At that point, defendant grabbed Dudley, put her on the ground, and ended up straddling her.

b. *Kim Kelley*

Kim Kelley testified that she dated defendant for about two or three months in 1999. They lived together for less than a month. Kelley testified there was never any violence between them, and that defendant was never aggressive toward her. Kelley never saw defendant get angry or violent.

c. *Duane Adams*

Duane Adams was married to Ginny Adams and was living with her at the time of the offense. Duane[2] grew up with defendant and had known him for more than 30 years. Duane testified that he drove to defendant's house to pick him up on February 7, 2010, after Dudley had hit him on the head with an ashtray. When Duane arrived, defendant was asleep and Dudley appeared calm. Dudley walked over to a heavy, white marble ashtray, picked it up, and told Duane, "I want you to tell whoever needs to hear it, a police officer or anybody, I want you to tell them that I took this ashtray and I hit him on the head with it." Dudley roused defendant, and Duane drove him back to the Adams' residence. Duane did not see any injury or blood on defendant.

d. *Frederick Fortner*

Frederick Fortner testified that he was one of defendant's best friends. He had known both defendant and Dudley since 1991. Around 1995 or 1996, Fortner and Dudley became romantically involved and Dudley moved in with him. Fortner testified that the relationship was fine at first, but "[b]etween our drinking and her fooling around, things got kind of ugly from time to time." They got in shouting matches and Dudley would hit him or throw things at him. On one occasion, Fortner grabbed her by the neck

---

[2] We refer to Duane Adams by his first name to avoid confusion.

and throttled her, whereupon defendant grabbed Fortner and took him away. After six years together, Fortner and Dudley broke up due to their fighting and her infidelity.

In 2007, Fortner and Dudley got back together for a two or three week period. Fortner broke off the relationship again when he realized Dudley was still drinking. Fortner testified that Dudley was a "hothead" when she drank, meaning she was very excitable and quick to anger. Fortner said he never felt so physically threatened by Dudley that he would have to defend himself to save his own life. He testified Dudley was a "little girl" and he had no doubt he could defeat her in a physical fight.

Fortner testified that defendant was not a violent person. But he also testified that he and defendant got into physical altercations on one or two occasions. On one occasion in 2009, defendant had quit drinking, but relapsed. They were driving to Boulder Creek when defendant insisted they stop at a bar for a beer. After defendant had drunk half a beer, "it was like a switch flipped and he started getting nasty with the bartender . . . ." Fortner grabbed defendant and took him out of the bar. On another occasion, Fortner picked up defendant, who was obviously inebriated, and started to drive him home. After they got into an argument, defendant got out of Fortner's truck and tried to rip the door off. Fortner drove away, and their friendship ended.

e. *Stewart Newell*

Stewart Newell, Dudley's son, was 19 years old when he testified at trial. Stewart had known defendant his whole life. Defendant had been a father figure to Stewart, and Stewart[3] looked up to him. Stewart had lived with defendant and considered him to be family. Stewart testified that defendant and Dudley had a caring, mutually beneficial friendship before they became involved romantically. Defendant once stepped in and protected Dudley when she got into an altercation with another person.

---

[3] We refer to Stewart Newell by his first name to avoid confusion.

15

Stewart testified that Dudley had been addicted to alcohol and pain pills. Sometimes Dudley "would get a little out of control . . . ." Dudley was a "tough lady" and she "wasn't the type to just roll over" or back down if she felt intimidated. Stewart testified that "[i]f she was backed into a corner she would defend herself," and "if someone came at her swinging she'd swing back." Stewart admitted he had previously told investigators "[Dudley] would be the first one to swing," but he testified he did not mean it literally. He also admitted he had told investigators "[Dudley] tend[ed] to start a lot—a lot of shit" when she was drinking. He added, "my mom was a brawler" but whenever she fought, it was because somebody had pushed her to it or backed her into a corner.

Stewart testified that he had called the police regarding Dudley twice. He had seen Dudley get into physical altercations with his sister on multiple occasions. Dudley hit Stewart once, but Stewart testified, "I asked for it," and "parents have to show they wear the pants." Dudley gave him "a pretty good fat lip" and knocked him to the ground. Stewart then called the police on her. Stewart testified that Dudley had had "quite a bit to drink" at the time. Child Protective Services and the police removed Stewart and his sister from the home.

Stewart testified that Dudley "seriously went off the deep end" on Mother's Day in 2009. Dudley had been drinking hard alcohol and was highly intoxicated. They were at a park by the river in Boulder Creek when Dudley began screaming at some kids who were jumping off a rock into the river. The police arrived, and Stewart had to convince them not to arrest her. The next day, Dudley left and stayed with her mother for two weeks in an attempt to quit drinking. Over time, however, Dudley slowly got "back into [her] old ways."

Stewart was present on the night when Dudley hit defendant with the ashtray. Stewart testified that defendant and Dudley had been drinking and arguing when he heard "some kind of commotion," and defendant "was kind of being out of line," at which point

16

Dudley called defendant's sister. When Duane Adams arrived, defendant was drunk and had to be helped out to Duane's car. After defendant left, Stewart asked Dudley what happened, and she told him "things got out of control" and she had hit defendant with an ashtray. She showed Stewart the ashtray. She told Stewart defendant had tried to strangle her while holding her down forcefully, so she clobbered him in the back of the head with the ashtray.

About a week after the incident, defendant came back. Defendant showed Stewart a scab and "a nice little dink" on the back of his head. Dudley and defendant got a 30-day notice soon afterward, and Stewart helped them moved into Robert Schneider's residence.

Stewart testified that Dudley was a "klutz" who always walked into things and bruised easily. When she combined alcohol with pain pills, she became more sluggish, and her reaction times were slower. Stewart never observed defendant physically afraid of Dudley. But Stewart admitted he once saw dark bruises on Dudley's neck that appeared to be the result of someone grabbing her throat.

f. *Jason Justman*

Jason Justman dated Dudley for about a year and a half around 2007 to 2009. He broke up with her due in part to her abuse of alcohol and pain killers. Justman testified that Dudley would become angry at him for trying to intervene with her drug habit. He described Dudley as "mouthy," defensive, and irrational when she was high on pills and alcohol. Justman once looked in Dudley's purse to see what kind of pills she was taking, whereupon she got offended and punched him in the chin. Justman described her as "uncontrollable" and testified: "She wants to hit like a man. She wants to hit hard. She aims to hit hard. That's the way her father taught her."

Justman witnessed multiple incidents of violence between Dudley and her children. In 2009, he called the police because Dudley and Stewart were "out of control," yelling and throwing things at each other. Stewart was mad at Dudley because she was

17

drunk. Justman heard what sounded like a physical altercation between them. On another occasion, Justman heard a commotion between Dudley and Stewart, and Stewart said something like "Don't hit me."

### g. *Aubrey Newell*

The parties stipulated that Aubrey Newell, Dudley's daughter, if called, would testify as follows: When she was young, defendant was her favorite person and was like a role model to her. In total, Aubrey[4] lived with defendant for a year and a half. Dudley had a drinking and pill-popping problem. Defendant would get violent when he drank, and Dudley was "kind of an instigator" when she drank. At some point, Aubrey saw strangle marks on Dudley's neck and faint bruises on her face. And Dudley would leave Aubrey and Stewart alone for up to three or four days at a time. In 2008, the police were called to their home. Aubrey did not see Dudley punch Stewart in the head, but she heard the sound of Dudley's hand hitting Stewart. On another occasion in 2009, Dudley slapped Aubrey in the face with the open palm of her hand.

## B. *Procedural Background*

The prosecution charged defendant by information with one count of murder. (Pen. Code, § 187, subd. (a).) The information included two special allegations: that defendant personally used a deadly and dangerous weapon in the commission of the offense, and that defendant had suffered two prior convictions resulting in a prison term. (Pen. Code, §§ 12022, subd. (b)(1), 667.5, subd. (b).) On January 22, 2013, in a bifurcated trial, the jury found defendant not guilty of first degree murder and guilty of second degree murder. The jury also found true the deadly weapon allegation. In a separate proceeding, the trial court found true the prior prison term allegation. The court sentenced defendant to a term of 17 years to life, composed of two consecutive one year terms for the two enhancements, consecutive to 15 years to life for the murder conviction.

---

[4] We refer to Aubrey Newell by her first name to avoid confusion.

## II. DISCUSSION

### A. *Admission of Linda Berry's Testimony*

As set forth above in Section I.A.6.a., Linda Berry, defendant's ex-wife, testified about several acts of violence that defendant committed against her during their marriage. Defendant contends the admission of this testimony was an abuse of discretion under Evidence Code section 352.[5] The Attorney General argues that the trial court properly admitted the evidence under sections 1103 and 352. We conclude the trial court did not abuse its discretion.

### 1. *Procedural Background*

Defendant moved in limine to exclude evidence of his prior acts against Berry under sections 1101, 1109, and 352. The prosecution argued the conduct was admissible under section 1109, which allows evidence of a defendant's commission of prior acts of domestic violence if certain foundational facts are satisfied. The trial court ruled that Berry's testimony was not admissible under section 1109 because the acts had occurred more than 10 years before the charged offense and admission of the evidence was not "in the interest of justice" under subdivision (e) of the rule. The prosecution then argued that certain incidents of violence upon Berry were admissible under section 1101, subsection (b), to prove intent, motive, and lack of self-defense. The trial court ruled that some of the prior incidents were admissible under section 1101, subdivision (b). These incidents included the head-butting incident and the incident in which defendant pulled wires out of the couples' truck and threatened to kill any man who assisted Berry.

The prosecution also moved in limine to admit evidence of defendant's acts of violence against Berry and others in the event defendant were to introduce evidence of Dudley's violent character. The prosecution argued that evidence of defendant's violent character would then be admissible under subdivision (b) of section 1103 (section

---

[5] Subsequent undesignated statutory references are to the Evidence Code.

1103(b)), which allows such evidence if other evidence is first introduced that a victim had a character trait for violence. The court indicated that some of the remaining incidents of violence against Berry would likely be admissible under section 1103(b), but the court also indicated it would likely limit the quantity of her testimony under section 352 pending the results of a hearing under section 402.

At trial, counsel for defendant cross-examined Robert Schneider about defendant's statements immediately following the attack on Dudley. Schneider testified that he had previously recounted defendant's statements to investigators, and that had he told them that defendant had stated, "She attacks me. [. . .] It happened a couple weeks ago. I had to restrain her." Schneider also testified that defendant had told him that Dudley had previously attacked him. Based on this testimony, the prosecution argued that defendant had elicited evidence of Dudley's violent character, thereby opening the door to evidence of defendant's violent character under section 1103(b). The court agreed that defendant had opened the door to evidence of his violent character, but the court deferred ruling on the admissibility of specific incidents pending Berry's testimony at a hearing under section 402. Defendant reiterated his objection under section 352.

At the hearing, Berry testified to numerous acts of violence or aggression committed by defendant against her and others. Under sections 1103 and 352, the court admitted testimony about the incidents set forth above in Section I.A.6.a. after finding this evidence to be probative and not unduly prejudicial. The court excluded other incidents as unduly cumulative or time consuming under section 352.

At the close of evidence, the court instructed the jury in accord with CALCRIM No. 852 as to evidence of violent acts committed against Dudley, Couser, and Sander, but the instruction did not include Berry as a victim since acts against Berry were not admitted under section 1109. The court further instructed the jury: "You have heard evidence that both the defendant and Deanna Dudley committed acts of violence other than those charged here. If you decide that one or both of them committed such acts, you

may but are not required to conclude from that evidence that the defendant and/or Deanna Dudley were disposed or inclined to commit acts of violence."

2. *Legal Principles*

Generally, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) But this rule does not prohibit admission of "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, [. . .]) other than his or her disposition to commit such an act." (§ 1101, subd (b).)

Section 1103 provides additional exceptions to the bar against character evidence. Under subdivision (a)(1) of this rule, "evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim" is not made inadmissible by section 1101 if a defendant offers such evidence to prove conduct of the victim in conformity with the character trait. However, upon offering such evidence, section 1103(b) provides an exception to section 1101 under which the prosecution may introduce evidence of the defendant's character for violence.

Under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "When evidence of prior offenses is presented to a jury, there is inherent danger of prejudice to an accused. Therefore, such evidence should be received with caution and admitted only when its probative value outweighs its prejudicial effect." (*People v. Evers* (1992) 10 Cal.App.4th 588, 599.) "The 'prejudice' referred to in Evidence Code section 352 applies to evidence

21

which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " (*People v. Yu* (1983) 143 Cal.App.3d 358, 377 (*Yu*).) "Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s)." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)  "A trial court has broad discretion in determining whether to admit or exclude evidence objected to on the basis of section 352 [citation], and rulings under that section will not be overturned absent an abuse of that discretion [citation].  '[T]he term judicial discretion "implies absence of arbitrary determination, capricious disposition or whimsical thinking." ' [Citation.]  '[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.'  [Citation.]" (*People v. Mullens* (2004) 119 Cal.App.4th 648, 658.) The abuse of discretion standard of review also applies to rulings under section 1103. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 828.)

3. *Admission of Berry's Testimony Was Not an Abuse of Discretion*

Defendant contends admission of Berry's testimony was an abuse of discretion under section 352 because the danger of undue prejudice substantially outweighed the probative value of the evidence.  He also argues that because the evidence was not admissible under section 1109, the trial court should not have admitted it under section 1103.  Defendant further argues that the evidence the court found admissible under section 1101 should not have been admitted under that code section.

22

As defendant notes, the thrust of his defense was that Dudley had attacked him first, whereupon he killed her to defend his own life. This defense put defendant's state of mind at issue, raising the question of whether he attacked Dudley because he feared for his life or acted instead out of anger, jealousy, or some other emotion tending toward unjustifiable violence. Thus, the question of whether defendant possessed some character trait for violence was highly probative, since a violent person is generally more likely than a nonviolent person to lash out unjustifiably in the absence of a dangerous threat.

We agree with defendant that the challenged testimony painted him in a bad light, but section 1103 explicitly allows the jury to consider acts of violence as evidence of defendant's violent character. Such evidence is necessarily damaging to a defendant, but, as we have noted, " 'prejudicial' is not synonymous with 'damaging.' " (*Yu*, *supra*, 143 Cal.App.3d at p. 377.) Furthermore, based on the factors set forth in *People v. Rucker*, *supra*, 126 Cal.App.4th at page 1119, the evidence was not *comparatively* prejudicial. First, the prior acts here—punching, shoving, choking, and head-butting— were less inflammatory than the charged conduct, wherein defendant fatally bludgeoned the victim's head with a flashlight. Second, there was no possibility the jury would confuse the prior acts with the charged conduct. Defendant inflicted the prior acts on two separate victims, one of whom testified and one who was deceased. The prior acts were not recent, and it does not appear defendant was ever punished for them. On balance, evidence of these prior acts did not establish a degree of prejudice that would substantially outweigh the probative value of the evidence. And while there was a cumulative aspect to the testimony when taken together with evidence of defendant's other prior bad acts, the evidence was not so cumulative as to result in undue prejudice. After receiving the witness's testimony in a hearing under section 402, the trial court balanced the prejudicial effect of the proffered conduct against its probative value and excluded certain acts as cumulative or unduly prejudicial. The court's analysis and weighing of the evidence was well within its discretion. In summary, we conclude the

trial court did not abuse its discretion under section 352 by admitting the prior acts of domestic violence.

As to sections 1101 and 1109, these sections do not trump section 1103. To the contrary, the language of the section 1103 explicitly sets forth an exception to section 1101: Evidence admissible under section 1103(b) "is not made inadmissible by Section 1101" when offered for the purpose of proving that a defendant acted in conformity with his violent character. Because the prior acts here were admissible under section 1103(b), the language of that statute mandates that we look beyond the requirements of section 1101. In any event, admission of the evidence under section 1101 alone would not have constituted an abuse of discretion, as the prior conduct was relevant and probative as to defendant's intent in the charged offense.

Defendant argues that evidence which is admissible under section 1103 should still be excluded under section 1109, but the two code sections cannot reasonably be construed in that fashion. By the plain language of the respective statutes, they allow for the admission or exclusion of evidence based on two different foundations. Nothing in section 1109 suggests it operates exclusive of section 1103, and nothing in section 1103 suggests it only applies to evidence that is also admissible under section 1109. We see no justification for subordinating the operation of section 1103 to the purposes of section 1109, as defendant asks us to do.

Finally, defendant contends that admission of his prior domestic violence conduct violated his federal due process rights. "But the admission of evidence, even if erroneous under state law, results in a [federal] due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439, italics original.) We conclude the admission of this evidence was not fundamentally unfair in violation of defendant's federal due process rights.

24

B. *Jury Instruction on an Initial Aggressor's Right to Self-Defense*

The trial court instructed the jury based on CALCRIM No. 3471 regarding the right to self-defense when a defendant engages in mutual combat or initiates the aggression. Defendant contends the giving of this instruction resulted in two different errors. First, he argues the instruction contains vague and ambiguous language. Second, he argues the instruction should not have been given because the evidence provided no factual basis for it. The Attorney General argues that the language of the instruction is not vague or ambiguous. She concedes the evidence provided no factual basis to support giving the instruction, but she argues the error was harmless.

We agree with the Attorney General that the language of the instruction is not vague or ambiguous, and we accept the concession that the evidence did not support issuance of the instruction. But we also agree with the Attorney General that the error was harmless because it is not reasonably probable the jury applied the instruction to defendant's detriment.

1. *Procedural Background*

Based on CALCRIM No. 505, the trial court instructed the jury on justifiable homicide committed in self-defense. And based on CALCRIM No. 571, the court instructed the jury on the lesser included offense of voluntary manslaughter committed in imperfect self-defense.

The trial court also instructed the jury based on CALCRIM No. 3471—the instruction at issue—as follows: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if[:] one, he actually and in good faith tried to stop fighting; and, two, he indicated by word or conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting; and, three, he gave his opponent a chance to stop fighting. If the defendant meets these requirements, then he had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non-deadly force and the

25

opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate his desire to stop to the opponent or give the opponent a chance to stop fighting.  [¶]  A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim of defense arose."

Finally, the trial court instructed the jury based on CALCRIM No. 200 as follows: "Some of these instructions may not apply depending on your findings about the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

2. *Legal Principles*

Penal Code section 197 provides for justifiable homicide in self-defense.  In relevant part, the statute qualifies the right to self-defense by stating that a defendant, "if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed"  (Pen. Code, § 197, subd. (3).)  The California Supreme Court has summarized this law as follows:  "Where one is making a felonious assault upon another, or has created appearances justifying that other in making a deadly counter attack in self-defense, the original assailant cannot slay his adversary and avail himself of the plea, unless he has first and in good faith declined further combat, and has fairly notified him that he has abandoned the contest.  And if the circumstances are such, arising either from the condition of his adversary, caused by the aggressor's acts during the affray or from the suddenness of the counter attack, that he cannot so notify him, it is the first assailant's fault, and he must take the consequences [citation]; for, as the deceased, acting upon the appearances created by the wrongful acts of the aggressor, would have been justified in killing him, he whose fault created these appearances cannot make the natural and legal

26

acts of the deceased looking to his own defense a justification for the homicide. Before doing so, he must have destroyed these appearances, and removed, to the other's knowledge, his necessity, actual or apparent, for self-preservation." (*People v. Hecker* (1895) 109 Cal. 451, 463-464 (*Hecker*).)

This rule further allows for lesser culpability based on imperfect self-defense, provided the victim's reaction to the initial aggression was unjustified. "[T]he defense [of imperfect self-defense] is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180.) If the victim's response to the initial aggression was legally justified, the defendant may not invoke imperfect self-defense. (*People v. Seaton* (2001) 26 Cal.4th 598, 664; *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.)

"The independent or de novo standard of review is applicable in assessing whether [jury] instructions correctly state the law [citations]." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole. We must also assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Romo* (1975) 47 Cal.App.3d 976, 990 (*Romo*), disapproved on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208, 213–214.)

3. *Defendant Suffered No Prejudice From the Instruction*

Defendant argues the instruction's use of the phrase "who starts a fight" is vague and ambiguous because it would allow a jury to apply the instruction when a defendant does not start a physical fight, but merely starts a verbal argument. He contends the law requires the rule to be applied only when the defendant initially commits some physical attack, and that the jury here could have misapplied the instruction in the absence of such a precondition by finding that he (defendant) merely initiated a verbal argument with Dudley.

27

We agree that the law limits application of the rule to circumstances under which a defendant starts a *physical* fight with a victim.  (*Hecker*, *supra*, 109 Cal. at p. 463.)  Furthermore, we agree that the phrase "who starts a fight," taken in isolation, would be insufficiently precise to limit application of the rule to the initiation of physical combat.  Dictionary definitions of the word "fight" include "a verbal disagreement" and "[a]n argument or quarrel" in addition to physical fights.  (Webster's 3d New Internat. Dict. (1993) p. 847; Oxford Eng. Dict. Online (2015).)  But we must look at the instruction as a whole, and we must assume the jury did so as well.  (*Romo*, *supra*, at p. 990.)  The instruction as a whole makes clear that "fight" refers to physical combat.  For example, the instruction states that "a fight is mutual combat when it began or continued by mutual consent or agreement."  The instruction also refers to the defendant's initial use of "non-deadly force," which clearly implies the use of physical force.  The instruction further states that the defendant has a right to self-defense "if the opponent continued to fight," which further implies that a "fight" involves physical force.  For these reasons, we conclude it is not reasonably probable the jury misapplied the instruction to interpret the word "fight" to mean a verbal argument.

Furthermore, any possible misinterpretation of the word "fight" would have been harmless.  Even if the trial court had explicitly instructed the jury that the word "fight" refers solely to physical combat, the jury could not have found defendant had a right to self-defense without also finding the other elements required by the instruction.  Thus, the jury would have to have found that defendant, after initiating the combat, "actually and in good faith tried to stop fighting" and "indicated by word or conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting."  The record holds no evidence that defendant tried in good faith to stop the fight or that he said or did anything that would have indicated to Dudley that he wanted to stop fighting.  Thus, the jury could not have found

28

defendant had a right to self-defense under this instruction, regardless of how they interpreted the word "fight." Any error in this regard was therefore harmless.

For the same reason, we agree with defendant that the evidence provided no factual basis to support the giving of the instruction. Because neither party presented any evidence that defendant attempted to stop the fight or communicated any intent to do so, the facts did not support issuance of an instruction conditioned on these elements. The instruction was therefore irrelevant.

Although the challenged instruction need not have been given, the jury was properly instructed based on CALCRIM No. 200 to ignore instructions that did not apply to the facts. In the absence of a showing to the contrary, we will assume the jury adhered to CALCRIM No. 200. Defendant points to nothing in the record to show the jury failed to heed this instruction or otherwise misapplied CALRCRIM No. 3471. Furthermore, " 'in most cases the giving of an abstract instruction is only a technical error which does not constitute ground for reversal.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 282 [quoting 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2950, p. 3624].) At most, the error is one of state law subject to harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.) "Under *Watson*, reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred."[6] (*Ibid.*)

Applying the *Watson* standard, we conclude inclusion of the instruction was harmless. For the reasons set forth above, it is not reasonably probable the jury applied the instruction in a manner that harmed defendant. We thus conclude defendant's claim is without merit.

---

[6] Defendant further asserts that the error constituted a federal due process violation requiring application of the harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18. Defendant cites no authority to support this proposition, and we are aware of none. Accordingly, we reject this argument.

C. *Instruction on Contrived Self-Defense*

The trial court instructed the jury based on CALCRIM No. 3472 as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use the force." Defendant contends the court erred by issuing this instruction because the evidence did not provide a factual basis to support it. The Attorney General contends the instruction was supported by the evidence.

We agree with the Attorney General. The prosecution presented evidence of numerous incidents in which defendant provoked a fight with a romantic partner. The jury was instructed that it could consider defendant's acts of violence against his ex-wife as evidence of a violent character. The jury could have inferred, based on this evidence, that defendant was acting in conformity with his violent character at the time of the offense. Furthermore, the jury could have concluded that defendant harbored the intent to manufacture a self-defense claim based on his post-offense conduct. While sitting at a table in the interview room of the sheriff's office, defendant appeared to engage in repeated attempts to create scratches on his wrists by rubbing them against the underside of the table. The jury could have inferred that this was an attempt to create evidence of defensive wounds in support of a claim of self-defense. The jury could have further inferred that defendant had been harboring such an intent several days before initiating the attack based on his text to Adams stating, "She will kill me."

Moreover, even if the evidence had not been sufficient to support issuance of the instruction, defendant has not shown any reasonable likelihood of prejudice resulting from the instruction. We disagree with defendant's assessment of the evidence regarding the use of self-defense. Contrary to defendant's characterization, this was not a "close case on the issue of justification." Dudley was a woman of small stature. By all accounts, defendant was an experienced fighter. The only evidence of any objective need for self-defense was defendant's own self-serving claim that Dudley had attacked him with the flashlight. Even if the jury had found that to be true, defendant never offered

30

any evidence that he believed the immediate use of deadly force was necessary for his own protection. The jury was required to find such a state of mind to establish either self-defense or imperfect self-defense, but defendant never presented any evidence that he feared for his safety at the time of the attack. Furthermore, based on the location of the blood spatter, it appeared Dudley's head had been struck while she was lying on the floor of the storage room with her head close to the floor. This evidence was inconsistent with defendant's claim of self-defense.

It is therefore unlikely the jury would have found defendant guilty of anything less than murder regardless of the challenged instruction. For these reasons, we conclude defendant's claim is without merit.

### III.    DISPOSITION

The judgment is affirmed.

_____

Márquez, J.

WE CONCUR:

_____

 Rushing, P. J.

_____

Grover, J.

No. H039575
People v. Chavez